GREENSBORO NEWS COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 69759, 74021.   Promulgated November 30, 1934.

*Charles D. Hamel, Esq., Alan E. Gray, Esq.,* and *E. R. Zane, C. P. A.,* for the petitioner.
*Paul A. Sebastian, Esq.,* for the respondent.

OPINION.

MORRIS: The respondent having determined deficiencies in income tax of $2,172.26 and $2,633.02, for the calendar years 1930 and 1931, respectively, the petitioner brings these duly consolidated proceedings for the redetermination thereof, alleging error on the part of the respondent by reason of his failure and refusal to permit the deduction of the respective amounts of $13,049.49 and $25,761.43, as interest upon so-called preferred stock, in the computation of its net taxable income for said years.

The petitioner, a newspaper publisher, was organized and incorporated under the laws of the State of North Carolina in 1912, with an authorized capitalization of $500,000, $250,000 of preferred and $250,000 of common, both having a par value of $100 a share. The outstanding preferred on January 1, 1930, was $71,000, and common $31,680.

After somewhat protracted negotiations, occasioned by the inability of the interested parties to agree upon a proper plan of financing, an agreement was entered into, under date of June 7, 1930, between Julian Price, individually, at that time president of the Jefferson Standard Life Insurance Co., referred to in such agreement, and E. B. Jeffress, individually, president of the petitioner, for the acquisition of the Record Co., also engaged in the newspaper publishing business in the city of Greensboro, which provided as follows:

WHEREAS, the undersigned Julian Price is now the sole owner of the total capital stock of the J. M. Reece Publishing Company, now known as The Record Company, consisting of two hundred and five (205) shares of the par value of $100.00 per share;

AND WHEREAS, the undersigned E. B. Jeffress, President of the Greensboro News Company, and a dominant stockholder thereof, desires, pursuant to an agreement entered into between him and the said Julian Price, to merge the two properties;

AND WHEREAS, preliminary to the perfecting of the necessary legal documents and changes of charter necessary to accomplish this purpose, it is desired by the said Julian Price and the said E. B. Jeffress that a memorandum evidencing the terms of the agreement should be executed by them;

NOW, THEREFORE, THIS AGREEMENT WITNESSETH,

That the said Julian Price hereby agrees to assign and transfer to the Greensboro News Company the above mentioned two hundred and five (205) shares of the total capital stock standing in the name of J. M. Reece Publishing Company, and in connection therewith to pay off a total bond issue aggregating $85,000.00 now outstanding against The Record Company, and also to deposit in bank the sum of Fifteen Thousand Dollars ($15,000.00) in cash to the credit of The Record Company, all upon the completion of the terms of the merger agreement entered into between the two said parties.

The said E. B. Jeffress, on his part, agrees to accept the said two hundred and five (205) shares of the J. M. Reece Publishing Company stock, and to cause and procure the Greensboro News Company to have its charter amended and authority given and the company to issue four thousand two hundred (4,200) shares of preferred stock of the par value of One Hundred Dollars ($100.00) each, 7% Cumulative and deliver to the said Julian Price for and in consideration of the stock of the J. M. Reece Publishing Company above referred to delivered by him to the Greensboro News Company.

It is further understood and agreed that the said E. B. Jeffress will carry through the merger upon the above considerations, accepting as true the balance sheet of The Record Company, copy of which is attached to an assignment by John Stewart Bryan, of Richmond, Virginia, S. E. Thomason, of Chicago, Ill., and Bryan-Thomason Newspaper, Inc., a Delaware corporation, of Chicago, Ill., executed on the 6th day of June, 1930, and accepted as of that date by Julian Price.

All guaranties in assignment by Bryan and associates to Price shall inure to the benefit of the Greensboro News Co.

It is further stipulated and agreed that said E. B. Jeffress and associates will cause the charter of the Greensboro News Company to be amended so as to authorize the issuance of five thousand (5,000) shares of preferred stock of the

par value of One Hundred Dollars ($100.00) per share, and that in view of the fact that it is proposed to sell 4,200 shares of this preferred stock to the Jefferson Standard Life Insurance Co., that the charter authorizations and by-laws of the Greensboro News Company shall be so changed and amended as to safeguard the rights, privileges and protection of the holders of this preferred stock as will be mutually satisfactory to the directors of Greensboro News Company and the Jefferson Standard Life Insurance Company.

It is understood that the two newspaper properties above referred to are to be merged and operated under one management, and that upon the signing of this agreement, the Greensboro News Company shall take charge and management of the Record properties, and that as promptly as the necessary papers and documents can be prepared, that the agreement hereinbefore recited shall be perfected and put into permanent form.

At a meeting of the board of directors of the petitioner, held on June 11, 1930, the foregoing agreement between Price and Jeffress was formally approved and a resolution was adopted providing for an amendment to the charter authorizing the issuance of 5,000 shares of cumulative preferred stock, par value $100, and 10,000 shares of common stock, without nominal or par value, the stocks to carry the following " rights, privileges, voting powers, restrictions and qualifications ":

(a) The payment of cumulative " dividends " of $7 a share, " when and as declared  *  *  *  out of earned surplus or net profits ", upon the preferred shares from January 1, 1931,

(b) While the preferred stock remains outstanding, the company shall not, without written assent of 75 percent of such outstanding preferred stock:

(1) Issue any stock having preference over or parity with such preferred stock, nor

(2) Mortgage the properties of the company to secure any indebtedness, with certain exceptions therein provided for but which are immaterial here.

(c) In the event of failure on the part of the company to pay four semiannual dividend installments upon the preferred shares after January 1, 1932, the entire voting privilege to vest in the holders of such shares with the right in them to replace the officers and directors in control, with a similar right in the common stockholders, exercisable upon the payment of such dividends as may then be in arrears.

(d) The preferred shares to be issued " subject to the condition and right vested in the corporation " to retire " all or any part " thereof at $105 a share.

(e) In the event of liquidation or dissolution of the company the preferred stockholders to receive par for their holdings, plus whatever dividends remain unpaid, before any payment upon the common shares.

(f) On July 1 of each of the years 1932 to 1935, there shall be set aside, in a stated depository, out of the "earned surplus or net profits" of the company, $10,000, and $25,000 on such date thereafter, for the retirement of the preferred stock until all of such stock has been retired.

The resolution provided that the rights and privileges of the common stock should be as follows:

(a) That it should be entitled to dividends after the payment of all dividends owing upon the preferred stock and provision made for the retirement thereof, as hereinabove provided, except that annual dividends thereon in excess of $7 per share should not be paid until the preferred stock issued and outstanding should be reduced to $100,000.

(b) Subject to the other provisions contained in said resolution, respecting the voting rights of the preferred stock, the common stock "shall have exclusive voting rights", and

(c) In the event of liquidation or dissolution it should be entitled to the entire assets remaining after satisfaction of all provisions for the preferred stock.

The foregoing action of the board of directors was ratified and approved by the stockholders at a meeting held on the same date, to wit, June 11, 1930.

The $71,000 par value of the old preferred stock of the petitioner was retired and replaced with the new, share for share. The certificate representing the old stock carried the following provisions:

It is mutually agreed between the holder hereof and the Greensboro News Company and its stockholders as follows: That this certificate of stock is a part of an authorized issue amounting in all to Two Hundred and Fifty Thousand Dollars, par value, authorized by an amendment to the Certificate of Incorporation of the Greensboro News Company, filed in the office of the Secretary of State of North Carolina on August 20th, 1924. This certificate of stock is issued subject to the terms and conditions therein set forth, which are made a part of this contract.

The holders of this Preferred Stock of the Corporation are entitled, as provided in its amended charter, to receive out of its net profits, cumulative dividends at the rate of, but never exceeding, seven per centum per annum, payable January 1st and July 1st of each year, before any dividend shall be paid to the holders of common stock, and on dissolution of the Corporation or distribution of its assets are also entitled, before any amount shall be paid to the holders of common stock, to be paid the par value of their stock and all unpaid cumulative dividends thereon at the rate aforesaid. The Preferred Stock shall have no voting power.

The Preferred Stock in whole or in part, by lot, may, at the option of the Corporation, at the time of paying any dividends, be retired by the Corporation at par, upon sixty days' notice in writing, by paying the owner thereof par value together with any dividends due thereon.

At a meeting of the board of directors of the petitioner on June 21, 1930, a resolution was adopted approving the charter as amended by the state, in the manner provided for in its previous resolution, hereinabove summarized, also the form of the preferred stock certificate to be issued thereunder, which form embodied the terms and conditions extracted from the previous resolution. Authorization was also given at that meeting to proceed with the purchase of the stock of the Record Co., as theretofore agreed upon between Price and Jeffress, for the payment of the purchase price, $420,000 par value of preferred stock, therefor, for the retirement of 710 shares of the old preferred stock, for the issuance of a similar number of shares therefor, and for the sale of the remaining 90 shares to the Jefferson Standard Life Insurance Co. pursuant to its offer to purchase said shares.

The $85,000 of first mortgage bonds which Price agreed to "pay off" in connection with his sale of 205 shares of stock of the Record Co., under the agreement of June 7, 1930, were canceled or paid off in accordance with that agreement.

Twenty thousand dollars of the newly issued preferred stock has been duly canceled in compliance with the plan set forth in the resolution of the board of directors of June 11, 1930.

In the preparation of its corporation income tax returns for the years 1930 and 1931 the petitioner claimed deductions of $13,049.49 and $25,761.43, respectively, as interest, representing the payments of dividends upon its preferred stock aforesaid. The respondent held that such payments did not constitute interest but were, in fact, dividends and he increased the net income for each of the taxable years by those respective amounts.

The petitioner contends that because of the many restrictions included in the terms of its new preferred stock and because of the rights and privileges reserved to the holders thereof, such stock was essentially equivalent to a bond and, being so, the payments in question constituted interest upon indebtedness under section 23 of the Revenue Act of 1928 and are therefore deductible in the computation of net taxable income.

We are quite willing to concede, as the petitioner contends, that the name by which the instrument of indebtedness is known is not conclusive as to its true character, *I. Unterberg & Co.*, 2 B. T. A. 274 — though the name given it may not be ignored, nor may we lightly assume that the parties have given an incorrect name to the instrument, *Kentucky River Coal Corporation*, 3 B. T. A. 644 — but where, as here, the respondent has determined that the instrument represented preferred stock and that the payments thereupon constituted ordinary dividends, the burden is placed upon the petitioner to show clearly that something different was actually accomplished.

The lawyer who prepared the agreement between Price and Jeffress testified, when asked the purpose of the parties to the agreement, that " I would say that the purpose of the instrument which I prepared was to issue a preferred stock which in the hands of any holder would be entitled to all the privileges and protections that were possible under the laws of this state for preferred stock." In reply to the question propounded to him upon cross-examination as to whether or not it was his understanding that the security was to be issued in the nature of a bond he said " No, I did not say the nature of a bond. I said it would be prepared so as to carry as many of the elements of protection under the law as was applicable to bonds, as nearly as might be."

The certificate here carried not the slightest intimation of an indebtedness, as such. It shows upon its face that it is preferred stock, that it is a part of the authorized capitalization of the company, and that the amounts payable thereon were to be paid as dividends. There is nothing in the contract between the parties, in the resolutions of the directors, nor in the certificates of stock guaranteeing, or even promising, the repayment of the amount invested.

Indeed it appears that the properties paid in were intermingled with the other assets of the business and subjected to the risks and hazards thereof without qualification or limitation. Dividends were not payable in any event, but only when and if declared by the board of directors, and even then payments were restricted to the earned surplus or net profits of the business. Interest, as such, would not have been so restricted but would have been payable from the gross revenues of the business as all other true expenses are. While there was a provision for a retirement reserve, thus giving rise to a probable maturity date, the right to retire was specifically " vested " in the corporation and the individual holder of stock was powerless to dictate when, if ever, the stock should be retired. Furthermore, the right vested in the corporation was to retire all or any part of the stock. Even though a reserve was provided for, and even assuming that the positive mandate to create the reserve created a right in the individual stockholder to demand retirement as and when such reserve was set aside, the reserve itself depended upon and was limited to " earned surplus or net profits " of the business. Therefore, if the business was unsuccessful there may never have been a retirement, a condition over which the stockholders individually or collectively had no control. Consequently, there was no positive obligation to pay dividends and there was no positive maturity date.

We are convinced from the facts that there was no intention to create a debtor-creditor relationship between the petitioner and its stockholders nor was any such relationship in fact established. As

we see it the interested parties were primarily concerned with reserving to the preferred stockholders as much preference over the common stockholders as the common stockholders themselves were willing to permit and to surround themselves with as many protective measures as consistent with the laws of the state governing the issuance of preferred stock. Cf. *Alexander Sprunt & Sons, Inc.*, 24 B. T. A. 599; reversed on other grounds 64 Fed. (2d) 424; *Northern Fire Apparatus Co.*, 11 B. T. A. 355; *Leasehold Realty Co.*, 3 B. T. A. 1129; *McCoy-Garten Realty Co.*, 14 B. T. A. 853; *Badger Lumber Co.*, 23 B. T. A. 362; *Finance & Investment Corporation*, 19 B. T. A. 643; affd., 57 Fed. (2d) 444.

A case strongly resembling the instant case, upon the facts, and reaching the result which we feel must be reached here, is *William Cluff Co.*, 7 B. T. A. 662. There, as here, the certificate of stock provided for the payment of 7 percent cumulative " dividends * * * out of surplus or net profits when and as determined by the board of directors." In that case there was a somewhat more positive right to redemption and the stock had no voting rights whatsoever, whereas, here, the stock had voting rights upon the failure in the payment of certain specified dividend payments. In that case, as here, there was provision against the issuance of other shares having priority and against encumbrance by mortgage of the corporate assets. There was, in that case, as here, a sinking fund provided for the redemption of the stock at a fixed price. Notwithstanding the reasonable probability of redemption and notwithstanding the many preferences retained and advantages gained by the preferred stockholders under their contract, as there shown, we held the amounts paid thereon to be dividends in fact and not interest, saying:

> Considering the contract between the petitioner and the preferred stockholders, we are of the opinion that there is nothing therein which takes the holders of the preferred stock out of the class of stockholders. To be sure the holders of this class of stock are preferred in such a manner that they are almost certain to have their stock redeemed. However, a preference over common stockholders makes them none the less stockholders. It appears to us that the contract between the petitioner and the preferred stockholders evidenced only an intention to create and maintain a preference in favor of the preferred as against the common stock.

*The Proctor Shop, Inc.*, 30 B. T. A. 721, to which the petitioner directs our attention, is clearly distinguishable.

For the above and foregoing reasons we are of the opinion that the respondent's determination that the amounts in controversy represented dividends, and not deductible interest, must be sustained.

*Judgment will be entered for the respondent.*