*Decision will be entered under Rule 50.*

HAFFENREFFER BREWING COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 96468. Promulgated February 20, 1940.

*Edward J. Keelan, Jr., Esq.,* and *Lawrence E. Green, Esq.,* for the petitioner.

*Charles P. Reilly, Esq.,* for the respondent.

## OPINION.

BLACK: Our first question is whether the amount of $86,451.67 is deductible in computing petitioner's "undistributed adjusted net income" as an amount "used or set aside to retire indebtedness incurred prior to January 1, 1934" under the provisions of section 351, Title IA, of the Revenue Act of 1934. That section reads in part as follows:

SEC. 351. SURTAX ON PERSONAL HOLDING COMPANIES.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid, for each taxable year, upon the undistributed adjusted net income of every personal holding company a surtax equal to the sum of the following:

\*      \*      \*      \*      \*      \*      \*

(b) DEFINITIONS.—As used in this title—

\*      \*      \*      \*      \*      \*      \*

(2) The term "undistributed adjusted net income" means the adjusted net income minus the sum of:

\* \* \* \* \* \* \*

(B) Amounts used or set aside to retire indebtedness incurred prior to January 1, 1934, if such amounts are reasonable with reference to the size and terms of such indebtedness; and

(C) Dividends paid during the taxable year.

(3) The term "adjusted net income" means the net income computed without the allowance of \* \* \*

\* \* \* \* \* \* \*

(4) The terms used in this section shall have the same meaning as when used in Title I.

Our second question is whether the amount of $39,550 is deductible in computing petitioner's "net income" as "interest paid or accrued within the taxable year on indebtedness" under the provisions of sections 21 and 23, Title I, of the Revenue Act of 1934. The material provisions of these sections are as follows:

SEC. 21. NET INCOME.

"Net income" means the gross income computed under section 22, less the deductions allowed by section 23.

SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(b) INTEREST.—All interest paid or accrued within the taxable year on indebtedness \* \* \*.

Since it is agreed that petitioner is a personal holding company, its tax liability for the year 1934 is determined by computing first its gross income and net income, respectively, under Title I, and then its adjusted net income and undistributed adjusted net income, respectively, under Title IA. The only items of this computation that are in dispute are the two items mentioned above. Under our first question we must determine whether the amount that was used in 1934 to retire a part of petitioner's preferred stock was used to retire "indebtedness incurred prior to January 1, 1934," as that term is used in section 351 (b) (2) (B), and under our second question we must determine whether the $39,550 that was paid out as dividends on the preferred stock was in substance interest paid on "indebtedness" as that term is used in section 23 (b). By virtue of section 351 (b) (4), the term "indebtedness" used in that section shall have the same meaning as when used in section 23 (b) of Title I.

The term "indebtedness" as used in section 351 (b) (2) (B) is defined in respondent's Regulations 86, article 351–4, as amended by T. D. 4777, Cumulative Bulletin 1937–2, p. 196, as follows:

The term "indebtedness" means an obligation, absolute and not contingent, to pay, on demand or within a given time, in cash or other medium, a fixed amount.

The term "indebtedness" does not include the obligation of a corporation on its capital stock.

Did the preferred shares which petitioner issued to the English company represent a capital investment in petitioner as the respondent contends, or did they evidence an indebtedness of petitioner to the English company as petitioner contends? The answer to this question must be determined from the terms and conditions under which the preferred shares were issued. *Commissioner* v. *O. P. P. Holding Corporation*, 76 Fed. (2d) 11; *Palmer, Stacy-Merrill, Inc.*, 39 B. T. A. 636; *United States* v. *South Georgia Railway Co.*, 107 Fed. (2d) 3.

Petitioner's preferred shares were issued in accordance with the agreement of June 23, 1930, the material provisions of which are set forth in our findings.

The circumstances leading up to the agreement of June 23, 1930, were testified to by petitioner's witness, Francis V. Barstow, the attorney who drew up the agreement. On direct examination Barstow testified that he was personally familiar with the circumstances surrounding the execution and delivery of the agreement; that the principal negotiators were Richard Bradfield (now deceased), representing the English company, and Haffenreffer; that the New Jersey company and R. & A. each owned a brewery in Boston; that Haffenreffer was the manager of both breweries; that Bradfield was the managing director of the English company; that during the prohibition era both breweries were making cereal beverages; that the business during the prohibition era was not as lucrative as it had been prior thereto; that Bradfield was continually offering suggestions to Haffenreffer as to how to run the business, which became very irksome to Haffenreffer; that in the fall of 1929 Haffenreffer wrote Bradfield that either he (Haffenreffer) would have to have control of the business or he would have to resign; that Bradfield then came to New York with power to negotiate their differences; that Bradfield was anxious Haffenreffer should continue as manager; that Barstow suggested a new corporation to which would be transferred the shares of the New Jersey company and the indebtedness of that company in exchange for nonvoting preferred stock in the new corporation, Haffenreffer to receive all the common stock in the new corporation in exchange for all the common stock in R. & A.; that Bradfield objected to taking the preferred stock thus suggested by Barstow and said:

* * * his form of investment would be entirely changed, and that, at that time, he felt it wise to get as much out of his investment as he could. Mr. Haffenreffer said that in the nature of the business, he could not expect people to put money in to buy out the English interest, but that he would loan to the new holding company one hundred thousand dollars, and that he was willing to permit approximately one-half of the earnings of the new holding company, or of the consolidated earnings of the breweries, to be used for the

purpose of retiring preferred stock to be given in addition to the one hundred thousand dollars. Mr. Bradfield then said he would like to get a certain amount of common stock as a gamble in the future of the business. Finally, the terms of the contract were agreed to * * *. [Direct testimony of Barstow.]

Upon cross-examination Barstow was asked whether it would not have been possible for the English company to have been a creditor rather than a preferred stockholder, whereupon Barstow answered:

That was considered carefully at the time of the negotiations. The result was that I did not feel that, in a Company of this particular kind, there should be a debt with a maturing obligation. I know we considered the question of English debentures, which have no maturity,—an attractive feature,—I did not know whether they were a proper kind of obligation to be issued by a Massachusetts corporation, so I fell back on the preferred stock.

The cross-examination of Barstow later continued as follows:

Q. Mr. Haffenreffer did not want to have the English company in a position where they could be a creditor and throw them into receivership?
A. The business was too precarious. He did not want a debt with a date of maturity on it.

Considering all the evidence relating to the terms and conditions under which the preferred shares were issued, we can arrive at no other conclusion than that the preferred shares in question were in fact preferred stock and not evidences of indebtedness. The dividends on the shares were payable only out of earnings. Likewise, the amounts which petitioner was obliged to set aside in the sinking fund were to be from earnings only. These are factors which evidence a capital investment rather than an indebtedness. Cf. *William Cluff Co.*, 7 B. T. A. 662; *Finance & Investment Corporation* v. *Burnet*, 57 Fed. (2d) 444; *Greensboro News Co.*, 31 B. T. A. 812; *Elko Lamoille Power Co.* v. *Commissioner*, 50 Fed. (2d) 595. The Fifth Circuit in the recent case of *United States* v. *South Georgia Railway Co.*, *supra*, said that "the most significant, if not the essential feature" of a debtor and creditor relationship as opposed to a stockholder relationship was the existence of a "fixed maturity for the principal sum with the right to force payment of the sum as a debt in the event of default." That feature is not present in the instant proceeding. The preferred stock in question did not have a definite maturity date such as the bonds had in *Commissioner* v. *O. P. P. Holding Corporation*, *supra*. In that case the interest could be deferred, but it together with the principal had to be paid in 1954, regardless of whether there was a surplus, which factor the court said "marks the vital difference between the shareholder and the creditor." In the instant proceeding Haffenreffer "did not want a debt with a date of maturity on it." Neither is there present here any guarantee of dividends or of redemption as was the fact in *Palmer, Stacy-Merrill, Inc.*, *supra*. Cf. *Dayton & Michigan Railroad Co.*, 40 B. T. A. 857. We think the evidence, taken as a

whole, shows a stockholding relation rather than the relation of debtor and creditor. We think it follows from this fact that both assignments of error must be decided in favor of the respondent. Petitioner, however, strongly contends that such a finding would only decide assignment of error (B) in favor of the respondent. In its brief petitioner says that so far as assignment of error (A) is involved "the position of the petitioner is by no means dependent upon whether the security, called preferred stock, was an indebtedness of the company."

Petitioner's contention on this point is that regardless of whether the preferred stock as such was an indebtedness of the petitioner to the extent of its par value, the *obligation* of the petitioner under the terms of the contract to use $86,451.67 of the 1933 consolidated net earnings in retirement of part of its preferred stock was an "indebtedness incurred prior to January 1, 1934" within the meaning of section 351 (b) (2) (B), and the sum of $86,400 so used in 1934 is deductible in computing its undistributed adjusted net income in 1934.

In support of this contention petitioner quotes from the last three paragraphs of Circuit Judge Haney's concurring opinion in *Peir* v. *Commissioner*, 96 Fed. (2d) 642, as exactly applying to the situation in the case at bar. It argues that "even though the entire issue of preferred stock may not be an indebtedness of the petitioner, an indebtedness has come into being and accrued by the end of 1933 to the extent of 1933 earnings which were required to be set aside and used to retire preferred stock."

In the *Peir* case, Peir was a stockholder and transferee of the Western Oxygen Co., hereinafter referred to as Oxygen, which company during 1929 had sold all of its assets to the Air Reduction Co. for 16,000 shares of the latter's stock. It was the intention of Oxygen to distribute the 16,000 shares (after disposing of 342 shares not here material) to its common and preferred stockholders and dissolve. One of the preferred stockholders refused to take Air Reduction Co. stock in exchange for his Oxygen preferred. The latter stock was redeemable on any dividend date. Oxygen thereupon adopted a resolution calling all of its preferred stock for redemption on a fixed day, May 31, 1929. It then sold 1,811 of the 16,000 shares for $184,922.61 in cash, which was all used to retire its preferred stock. This sale was made at a profit to Oxygen of $140,204.22. Since Peir as transferee was charged with the tax liability of Oxygen, he contended, among other things, that the profit of $140,204.22 should not be recognized in determining Oxygen's tax liability; that in substance Oxygen's tax problem should be viewed as if it had sold all of its assets to the Air Reduction Co. for $184,922.61 in cash and 14,189 shares of the latter's stock instead of for 16,000 shares; and that so viewed the only gain to Oxygen would be the gain of approxi-

mately $1,000,000 on the sale of its assets, which gain Peir contended was not recognizable under section 112 (d) (1) of the Revenue Act of 1928. Circuit Judge Haney was of the opinion that even if it be assumed that the plan contemplated receipt of stock and money, the adoption of the resolution to call the preferred stock for redemption made the preferred stockholders creditors, thus bringing into application section 112 (d) (2) of the act and rendering Oxygen taxable for the gain realized, under *Minnesota Tea Co.* v. *Helvering*, 302 U. S. 609.

We do not think that the concurring opinion of Circuit Judge Haney is applicable in the instant case. After the adoption of the resolution in the *Peir* case, there was a definite date fixed for the retirement of the preferred stock. It was thereby given the status of a debt with a definite date of maturity. In the instant case there was no status of debtor and creditor with a fixed maturity date prior to January 1, 1934. It is true that petitioner during 1933 realized sufficient earnings that would compel it to set aside $86,451.67 "for the said sinking fund" and that under its contract with its preferred stockholders it was under obligation to "apply the sinking fund to the redemption of preferred shares or the purchase of preferred stock", but we do not think the mere accruing of the earnings during 1933 was sufficient to change a part of petitioner's preferred stock into an indebtedness.

The amount of the 1933 earnings was first determined in 1934. Under the *sinking fund* provision of the June 23, 1930, agreement the shares were to be redeemed "in the manner provided for the call of the preferred shares." This manner was set out in detail under the *redemption* provision of the same agreement, and there could be no fixed date of retirement until these provisions had been complied with. This did not occur until some time during 1934. It may be true that when petitioner at some time in 1934 called a certain part of its preferred shares for redemption under the sinking fund arrangement, a debtor and creditor relationship then arose between petitioner and the owners of that part of its preferred shares called for redemption. That point we do not have to decide in this proceeding. But as we view it there was certainly no creditor and debtor relationship prior to that time. Up until the call for redemption went out, petitioner had the right to "apply the sinking fund to the redemption of preferred shares at the par value thereof and accumulated dividends or to the purchase of preferred shares at not to exceed the par value thereof and accumulated dividends." Certainly if petitioner should elect to exercise its right to purchase preferred shares at not more than par plus accumulated dividends, if there were any available at that price, there could be no relationship of debtor and creditor between petitioner and the holders of preferred shares until some kind of a contract of purchase had actually been entered into. So it seems to us

that it can not be said that any indebtedness arose prior to January 1, 1934, on the part of petitioner to the owners of the preferred shares which were redeemed in 1934. We think it follows that the $86,400 used by petitioner during 1934 to retire that much of its preferred stock was not used "to retire indebtedness incurred prior to January 1, 1934" as that phrase is used in section 351 (b) (2) (B) of the Revenue Act of 1934. Cf. *Tennessee Co.*, 40 B. T. A. 154; *American Foundation Co.*, 40 B. T. A. 542.

As an alternative petitioner contends that if the amount of $86,400 used in 1934 to retire preferred stock was not used to retire indebtedness, then it was a dividend paid during the year and consequently deductible under section 351 (b) (2) (C) of the Revenue Act of 1934. Under this section the respondent did allow the amount of $39,550 as dividends paid during the taxable year, and it is petitioner's position under this alternative contention that in addition to the amount of $39,550 the respondent should also allow the amount of $86,400 as a dividend paid. Petitioner says this point depends upon section 115 (g) of the Revenue Act of 1934 as it has been construed. That section reads as follows:

(g) REDEMPTION OF STOCK.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

We do not see any merit in this alternative contention. The amount of $86,400 was an amount paid out by petitioner during the taxable year to retire its preferred stock and seems clearly a partial liquidation under section 115 (i). There is no evidence in the case which would tend to show that the payment was essentially equivalent to the distribution of a taxable dividend. Cf. *Pearl B. Brown, Executrix*, 26 B. T. A. 901; affd., 69 Fed. (2d) 602; *Henry B. Babson*, 27 B. T. A. 859; affd., 70 Fed. (2d) 304.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

SMITH, dissenting: The tax with which we are here concerned is an "undistributed adjusted net income" tax. It is a tax in the nature of a penalty imposed upon a corporation for failing to distribute to its stockholders amounts which it could distribute. In the Ways and Means Committee Report, 73d Cong., 2d sess., Rept. 704, it was said of section 351 of the Revenue Act of 1934:

\* \* \* Thus, a corporation which falls within this section because of the nature of its business and the number of its stockholders can always escape this tax by distributing to its stockholders at least 90 percent of its adjusted net income.

In *Foley Securities Corporation* v. *Commissioner* (C. C. A., 8th Cir.), 106 Fed. (2d) 731, affirming 38 B. T. A. 1036, the court said:

There can be no doubt that the purpose of Congress in enacting Section 351 was to compel each personal holding company to distribute its current earnings instead of accumulating them, so as to augment the income of its shareholders, thereby increasing the amount of their tax liability. There is nothing, aside from the letter of the statute, to indicate that Congress intended to impose a 30 percent surtax upon the current earnings of such a corporation not available for "dividends" but actually distributed to its shareholders. \* \* \*

The petitioner was not able to distribute to its stockholders as dividends in 1934 $86,451.67 of its earnings for 1933 by reason of its contract which it had entered into with the English company on June 23, 1930. Those earnings had to be used pursuant to its contract in the redemption of its preferred stock. The amount was required to be set aside in a sinking fund for the redemption of those preferred shares. Of the amount thus placed in its sinking fund $86,400 was used in 1934 in the redemption of a like amount of preferred stock.

It seems to me that at the end of 1933 the petitioner was obligated to pay $86,451.67 into its sinking fund for the redemption of the preferred shares. It had a debt of that amount at the end of 1933. The obligation was incurred prior to 1934. I think that the obligation constituted indebtedness incurred prior to January 1, 1934. See *Peir* v. *Commissioner* (C. C. A., 9th Cir.), 96 Fed. (2d) 642, 651.

If this is not so, it seems to me that the purpose of Congress in imposing this tax only upon undistributed adjusted net income in many cases which might be visualized is frustrated. Assume that a corporation purchased an oil lease in 1933 for a cash consideration of $100,000 and that it undertook on its part to pay, in addition thereto, one-fourth of its profits from the lease for the next five years. Assume that it has profits of $100,000 from the lease in 1934, the payment of $25,000 to the vendor of the oil lease in 1934 or 1935 is additional cost to the corporation of the oil lease. The $25,000 which it must pay to the vendor corporation is not a legal deduction from gross income as an ordinary and necessary expense. Can it be denied, however, that concurrently with the earning of $100,000 in 1934 it has an indebtedness to the vendor of the oil lease of $25,000. I think not. I can perceive no difference in substance between such a case and the proceeding at bar. At the end of 1933 the petitioner was obligated to set aside $86,451.67 in its sinking fund for the redemption of its preferred shares. It seems to me that this indebtedness was incurred prior to January 1, 1934.

I agree with the majority opinion that the outstanding preferred shares of the petitioner did not constitute an indebtedness of the petitioner considered apart from its contract with the English company dated June 23, 1930. The petitioner contends, however, that by reason of its contract with the English company it was indebted to the English company at the end of 1933 in the amount of $86,451.67. I think that contention is sound.

MELLOTT and HARRON agree with this dissent.