**HAFFENREFFER BREWING CO. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 3593.

Circuit Court of Appeals, First Circuit.

Dec. 23, 1940.

David Burstein, of Boston, Mass. (Edward J. Keelan, Jr., and Lawrence E. Green, both of Boston, Mass., on the brief), for petitioner for review.

George H. Zeutzius, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch and Morton K. Rothschild, Sp. Assts. to Atty. Gen., on the brief), for Commissioner of Internal Revenue.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAHONEY, Circuit Judge.

This is a petition for review of a decision of the Board of Tax Appeals involving the surtax imposed on a personal holding company by Section 351 of the Revenue Act of 1934, 48 Stat. 751, 26 U.S.C.A. Int.Rev.Acts, page 757. The taxpayer in 1934 paid the sum of $86,400 out of its 1933 net income for the retirement of part of its outstanding preferred stock in accordance with the terms of a contract entered into in 1930, and deducted that sum from its undistributed net income as the retirement of indebtedness within the meaning of Section 351(b) (2) (B) [1]. The Commissioner of Internal Revenue disallowed the deduction, and the Board sustained the determination by the Commissioner of a surtax deficiency of $26,329.47 for the year 1934.

The taxpayer is a Massachusetts corporation and a personal holding company within the meaning of Section 351(b)(1) of the Revenue Act. It was organized pursuant to the terms of a contract entered into in 1930 between the New England Breweries Co., Ltd., hereinafter referred to as the English company; the Royal & Ancient Co., Ltd., a Massachusetts corporation, hereinafter referred to as R. & A.; and Theodore C. Haffenreffer, an individual residing in Boston, Massachusetts.

At the time the contract was entered into the English company owned all of the outstanding shares of the capital stock of the New England Brewing Company, a New Jersey corporation, hereinafter referred to as the New Jersey company. Haffenreffer and his associates owned all of the common and the New Jersey company all of the preferred stock of R. & A. The New Jersey company was indebted to the English company in the sum of $800,000. The contract recited that Haffenreffer was the manager of both the New Jersey company and R. & A. and it was "deemed advisable by the parties hereto to have the business of the said two com-

---

[1] "351. Surtax on Personal Holding Companies

"(a) Imposition of Tax. There shall be levied, collected, and paid, for each taxable year, upon the undistributed adjusted net income of every personal holding company a surtax * * *.

"(b) Definitions. As used in this title * * *

"(2) The term 'undistributed adjusted net income' means the adjusted net income minus the sum of: * * *

"(B) Amounts used or set aside to retire indebtedness incurred prior to January 1, 1934, if such amounts are reasonable with reference to the size and terms of such indebtedness."

panies conducted by a single unit under the management of Haffenreffer." The taxpayer corporation was organized to accomplish this purpose. Its capitalization consisted of 7,000 shares of common stock of no par value and 5,900 shares of preferred stock of a par value of $100 each. The English company surrendered to the taxpayer all of the stock of the New Jersey company, and assigned to it all of the debts· due from the New Jersey company to the English company, which included a loan of $800,000, and received in exchange $100,000 in cash, 5,900 shares of the taxpayer's preferred and 1,800 shares of its common stock. Haffenreffer and his associates surrendered all the shares of the common stock of R. & A. and received 5,200 shares of the taxpayer's common stock.

The contract contained certain provisions relative to the preferences, restrictions, qualifications, and voting powers of the preferred stock. The preferred shares were entitled to a cumulative dividend of 7 per cent per annum or one-half the net earnings available for dividends, whichever was less, before the common stock got any dividends. After the preferred dividend was paid, common was entitled to six dollars per share; and if there were anything left over, preferred and common were to share equally. The dividends were to be paid from surplus or net profits when and as declared by the board of directors. The preferred shares had no voting rights except on the question of an increase in the authorized number of preferred shares or a change in their rights or priority. On liquidation or dissolution, the preferred stock was entitled to sixty-five dollars per share plus accumulated unpaid dividends before any payment to the common stock or one-half of the net amount realized by the company on dissolution, whichever was lesser. The other half of the proceeds of the assets was to be divided equally between the shares, whether preferred or common, provided that the total received by the preferred should not exceed 105 per cent of par value plus a sum equal to the accumulated and unpaid dividends.

However, for the purposes of this case, the most important of these provisions, which were included in the Articles of Organization, were those pertaining to the redemption of all or any part of the preferred shares and the requirement for a sinking fund. These provisions are as follows:

"Redemption: The Company may at any time redeem all or any part of the preferred shares by giving a notice of its intention so to do, to the holders of the preferred shares to be redeemed by mailing to them post-paid at their last address appearing upon the books of the Company at least thirty (30) days prior to the date fixed for redemption, a copy of the said notice. Such notice need only state the time and place of redemption and the number of shares to be redeemed. In case of the redemption of a part only of the preferred shares, the Company shall designate by lot or in such manner as the board of directors may determine the shares to be redeemed. The holders of preferred shares called for redemption, other than by means of the sinking fund, shall be entitled to receive in respect of each share so called for redemption, one hundred and five (105) dollars and a sum equal to all dividends accumulated and unpaid to the date of redemption. From and after the date of redemption, as aforesaid, the holders of the preferred shares called for redemption shall cease to enjoy or exercise any of their rights or privileges as such holders, unless payment of the said shares shall be refused upon presentation thereof, in accordance with terms of the notice. The preferred shares so redeemed shall not be reissued by the Company.

"Sinking Fund: The Company shall set aside in each of the years 1930, 1931 and 1932, not less than one-sixth (1/6) of the net earnings available for dividends as a sinking fund provided that in the event the preferred share dividend requirements in any of the said years shall equal or exceed one-half (1/2) of the net earnings available for dividends, no part of the net earnings for such year need be set aside for such sinking fund and after the year 1932, an amount of the net earnings shall be set aside annually for the said sinking fund equal to the difference between fifty (50) per cent. of the net earnings available for dividends for such year and a sum equal to seven (7) per cent. of the par value of all of the preferred shares outstanding and not in the possession of the Company at the end of such year, or to one-sixth (1/6) of the said net earnings for such year, whichever is the lesser amount. The Company shall have the right to and shall apply the sinking fund to the redemption of preferred shares at the par value thereof and accumulated dividends or to purchase of preferred shares at not to exceed the par

value thereof and accumulated dividends, provided, however, that the sinking fund need not be used for the redemption of the preferred shares unless the amount therein applicable for such purpose shall amount to at least five thousand (5,000) Dollars. The shares shall be redeemed in the manner provided for the call of the preferred shares. The preferred shares so purchased or redeemed shall not be reissued by the Company."

The Board found that during 1933 consolidated net earnings as defined in the by-laws of the taxpayer were such that the taxpayer was required by the contract to which it became a party on August 1, 1930, and by the provisions of its preferred stock which was issued on August 1, 1930, to set aside the sum of $86,451.67 as a sinking fund for the purchase or redemption of its preferred stock. It also found that in accordance with the taxpayer's practice, the consolidated net earnings for the year 1933 as defined in the taxpayer's by-laws were stated by the taxpayer's auditors early in the year 1934; and immediately thereafter in 1934 the taxpayer received dividends from its subsidiaries of the sum necessary to pay dividends on the outstanding. preferred stock of the taxpayer and to meet the sinking fund requirement of $86,451.67; and the taxpayer applied $86,400 for the retirement of the preferred stock in accordance with the provisions of the contract and the terms of its preferred shares.

The question is whether in computing the personal holding company surtax, the payment of $86,400 by the taxpayer in 1934 to retire part of its outstanding preferred stock in accordance with the terms of the contract entered into in 1930, is deductible as an amount "used or set aside to retire indebtedness incurred prior to January 1, 1934" within the meaning of Section 351 (b)(2)(B) of said Revenue Act.

█ The problem is a difficult one. The issue of the preferred stock on its face resembles a true stock issue, yet it is complicated by a requirement to redeem it out of earnings. The evidence as to the facts surrounding the issue is ambiguous. There was testimony that Mr. Haffenreffer did not want a debt with a fixed maturity date as he did not wish the English company to be in a position to force him into receivership. On the other hand, the Eng-

lish company demurred to taking preferred stock on the ground that it would change its investment which at that time comprised ownership of all the common stock of the New Jersey company plus the debts owing by the latter to the former. However, it is apparent that the English company did not wish to retire from participation in the business since the sole purpose of the formation of the holding company was to provide a way to retain Mr. Haffenreffer as manager of the companies, as desired by both parties. It was testified that non-maturing debentures were considered, but were finally abandoned in favor of preferred stock with a redemption provision. We do not believe that the payment made in conformity with that redemption provision was an "amount used to retire an indebtedness" within the meaning of Section 351(b)(2)(B) of the Revenue Act of 1934.

█ Giving consideration to all of the terms and conditions of the stock, we are forced to conclude that it is a true certificate of ownership in the corporation and not evidence of an indebtedness owed by the corporation. The dividends were to be paid from earnings only, and the amounts to be set aside in the sinking fund were likewise only to come from earnings. The preferred stock also was entitled to share equally in earnings with the common stock after each had received specified dividends. These factors evidence capital investment rather than indebtedness. Warren v. King, 1883, 108 U.S. 389, 398, 2 S.Ct. 789, 27 L.Ed. 769; Commissioner v. Schmoll Fils Associated, 2 Cir., 1940, 110 F.2d 611; Finance & Investment Corp. v. Burnet, 1932, 61 App.D.C. 78, 57 F.2d 444. Perhaps the most significant fact is the lack of a fixed maturity date at which time the holder can demand payment whether or not there are net earnings. This is the essential feature of the debtor-creditor relation. Warren v. King, supra; United States v. South Georgia Ry. Co., 5 Cir., 1939, 107 F.2d 3, 52 Harv.L. Rev. 1363.

█ It has been many times decided that amounts paid on preferred stock were not deductible as "interest paid on indebtedness" within the meaning of Section 23(b)[2] of the Revenue Act of 1934, 26 U.S.C.A. Int.Rev.Acts, page 672, and correspond-

[2] "§ 23. Deductions from Gross Income. In computing net income there shall be allowed. as deductions: * * *

"(b) Interest. All interest paid or accrued within the taxable year on indebtedness, * * *."

ing sections of other Acts, even though provision has been made for redemption of the stock at a particular time or by a particular means. Jewel Tea Co. v. United States, 2 Cir., 1937, 90 F.2d 451, 112 A.L.R. 182; Finance & Investment Corp. v. Burnet, supra; Kentucky River Coal Corp. v. Lucas, D.C.W.D.Ky.1931, 51 F.2d 586, affirmed per curiam, 6 Cir., 1932, 63 F.2d 1007; cf. In re Culbertson's, 9 Cir., 1932, 54 F.2d 753 (holder of preferred stock with fixed redemption date held not creditor in bankruptcy proceedings); Hazel Atlas Glass Co. v. Van Dyk & Reeves, Inc., 2 Cir., 1925, 8 F.2d 716, certiorari denied VanDyk v. Young, 1925, 269 U.S. 570, 46 S.Ct. 26, 70 L.Ed. 417 (same). These cases are particularly persuasive as the statute provides expressly that the words in Section 351 and Section 23(b) shall have the same meaning.[3] The Board of Tax Appeals in similar cases both before and since the enactment of the personal holding company tax here in question in cases strikingly similar to the one now before us have likewise denied that there was an indebtedness. See, e. g., William Cluff Co., 1927, 7 B.T.A. 662; Greensboro News Co., 1934, 31 B.T.A. 812; May Hosiery Mills, Inc., 1940, 42 B.T.A. 646; Spaulding Bakeries, Inc., 1940, 42 B.T.A. 430.

■ However, the taxpayer argues that even though the retirement of the preferred stock is not the retirement of an indebtedness, the payment in accordance with the contract to retire is an amount used to retire an indebtedness, the indebtedness being the contractual obligation to retire the preferred stock. We do not believe that "indebtedness" as used by Congress in Section 351(b)(2)(B) was intended to cover such a situation.

■ The argument would require the allowance of the deduction in every case where there was an enforceable obligation to pay out money. We believe Congress used the word in its more usual sense of corporate indebtedness such as bonds, notes, and debentures. To say that the retirement of the preferred stock is not the retirement of an indebtedness, but that the retirement of the obligation to retire the preferred is a retirement of an indebtedness does not seem reasonable. The argument would seem to involve the acceptance of the proposition that though the retirement of preferred stock is not the retirement of indebtedness, still if a board of directors should adopt an enforceable resolution providing for the retirement of certain shares, the fulfilling of the resolution would allow a deduction as the retirement of an indebtedness. Such a result seems to indicate that the argument is more ingenious than sound. Cf. In re Piccadilly Realty Co., 7 Cir., 1935, 78 F.2d 257, 261.

The subsequent legislative history of Section 351(b)(2)(B) confirms our views. When first enacted the deduction was said to "substantially and properly relieve personally owned corporations which have outstanding bonds or other indebtedness that must be met from current earnings before distribution can be made." See, Sen. Rep. No. 558 (73rd Cong., 2nd Sess. 1933) 15. It may be noted in passing that the amount paid into the sinking fund for the redemption of the preferred stock is set aside from the earnings "available for dividends". At this time it was already well settled that preferred stock even with an obligation to redeem was not an indebtedness. Finance & Investment Corp. v. Burnet, supra; In re Culbertson's, supra; Kentucky River Coal Corp. v. Lucas, supra; Hazel Atlas Glass Co. v. Van Dyk & Reeves, Inc., supra. The Regulations[4] first interpreting the deduction in question provided that only indebtedness incurred to raise capital was meant. This necessarily excluded commercial indebtedness

---

[3] Section 351(b)(4). "The terms used in this section shall have the same meaning as when used in Title I."

[4] "Reg. 86, T.D. 4503, XIII—2 C.B. 103 (1934) Art. 351—4. Amounts Used to Set Aside or Retire Indebtedness Incurred Prior to January 1, 1934.—If, pursuant to a bona fide plan for the retirement of its bonds, debentures, or similar obligations, representing indebtedness incurred prior to January 1, 1934, for the purpose of raising capital * * * the taxpayer—

"(1) retires during the taxable year an amount of such indebtedness, or

"(2) establishes a sinking fund or reserve for the retirement of such indebtedness during the taxable year, and sets aside in such fund or reserve an amount for the retirement of such indebtedness —in determining the undistributed adjusted net income for the taxable year, a deduction from the adjusted net income is allowable in a reasonable amount in respect to the amount so paid or set aside in such fund or reserve during the taxable year * * *."

such as borrowing on notes for current expenses or expansion. This was an unwarrantedly narrow interpretation. Cf. Robert Hughes & Co. v. Commissioner, 8 Cir., 1940, 109 F.2d 720. Section 351(b)(2)(B) was left unchanged in the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 936.

In 1937, in spite of the recommendations of the Joint Committee on Tax Evasion and Avoidance (Report of Aug. 5, 1937 at p. 5) that the deduction be eliminated, it was retained by Congress, as Section 355 (b), 26 U.S.C.A.Int.Rev.Acts, page 941, and clarified to read "amounts used or *irrevocably* set aside to *pay or to* retire indebtedness *of any kind* incurred prior to January 1, 1934". (The italics indicate the changes.) The insertions were specifically called "clarifying amendments" and the deduction was continued to prevent hardship "because of a necessity for legal reasons of using the earnings and profits to discharge the debts". See, Sen.Rep.No. 1242 (75th Cong., 1st Sess. 1937) 2; H.R. Rep.No. 1546 (75th Cong., 1st Sess. 1937) 10–11. Thereafter, the Regulations were amended to eliminate the necessity for a capital indebtedness but to require that the "indebtedness" be an absolute and not a contingent obligation to pay on demand or at a fixed date a certain amount and to provide that "The term 'indebtedness' does not include the obligation of a corporation on its capital stock". Reg. 86, Art. 351–4, as amended by T.D. 4777, 1937–2C.B. 196, 197.

The most significant amendment was suggested in 1938. The section passed the House of Representatives and reached the Senate floor, as Section 405(b), in the same form as in 1937. There, it was amended, without debate, to read "amounts used or irrevocably set aside to pay or to retire indebtedness *(including preferred stock containing therein contractual obligations enforceable by the holders of such stock for the retirement of the same on a fixed date)*, of any kind incurred prior to January 1, 1934". (Italics supplied.) Following this amendment, the bill went to the Conference Committee of the House and Senate where the parenthetical amendment was deleted. The Report (H.R. Rep. No. 2330 (75th Cong., 3rd Sess. 1938) 48) dealt with the amendment as follows:

"The Senate Amendment permits a personal holding company in determining its 'undistributed Title I A net income' to deduct amounts used or irrevocably set aside to pay or retire preferred stock issued prior to January 1, 1934, and containing contractual obligations enforceable by the holders of such stock, for the retirement of the same on a fixed date. The Senate recedes."

Thus we have the unusual situation where Congress knowingly dealt with practically the exact question involved in this case and specifically rejected the deduction. The language of the conference committee report leaves no doubt in our minds that Congress considered that the language of the section without the amendment did not allow the deduction of amounts used to retire preferred stock pursuant to a contract and that Congress by rejecting the amendment intended not to sanction the deduction of such amounts. Adding this to the fact that preferred stock had long been held not to be an indebtedness, even though there were provisions for its redemption, we are convinced that the amount paid out of the sinking fund to redeem the preferred shares, was not "an amount used to retire an indebtedness" within the meaning of Section 351(b)(2)(B) of the Revenue Act of 1934.

An analogous situation which has been more discussed is found in the corporate credits allowed against the Undistributed Profits Tax by Section 14(a)(2) [5] in the Revenue Act of 1936, 49 Stat. 1655, 26 U.S. C.A. Internal Revenue Acts, page 823. The tax was first enacted in Section 102 of the Revenue Act of 1934, 26 U.S.C.A.Int. Rev.Acts, page 690, the Act here under consideration. The tax was designed to supplement Section 351 and "take care of those corporations which do not fall within the category of personal holding companies but which, nevertheless, accumulate surplus to prevent imposition of surtaxes on their stockholders". Sen.Rep. No. 558, supra, at 30.

The 1934 tax on undistributed profits was not effective, and in 1936 it was revised to make it so. In computing the income on which the surtax is to be levied, certain credits are allowed. Section 26 (c)(1), 26 U.S.C.A. Int.Rev.Acts, page 836,[6] pro-

---

[5] "§ 14. Surtax on Undistributed Profits

"(a) Definitions. As used in this title—

\* \* \*

"(2) The term 'undistributed net in-

come' means the adjusted net income minus the sum of \* \* \* the credit provided in section 26(c), relating to contracts restricting dividends."

[6] "§ 26. Credits of Corporations. In

vides for the credit of amounts which cannot be distributed because of contracts restricting the right to give dividends. It seems quite clear that in the computation of the undistributed profits tax the taxpayer would be entitled, under Section 26 (c) (1), to a credit of the $86,400 involved in the instant case. Cf., I.T. 3152, 1938–1 C.B. 155; I.T. 3139, 1937–2 C.B. 111; see, Paul & Mertens, The Law of Federal Income Taxation (Supp.1939) § 32A.42. Section 26(c) (2) [7] allows the credit of amounts required by contract to be paid in discharge of a debt. The Regulations[8] provide that amounts paid to retire preferred stock pursuant to a contract are not considered as the discharge of a debt. This position has been approved as a sound interpretation of the statute. See, Hendricks, "The Surtax on Undistributed Profits of Corporations", (1936) 46 Yale L.J. 19, 29; but cf. Paul & Mertens, op.cit., at § 32A.47; Note, (1936) 36 Col.L.Rev. 1321, 1347. The Revenue Act of 1936 also contains the personal holding company tax provision identical with Section 351, and there is no deduction allowed similar to that of Section 26(c) (1) which would have included the amount in controversy. This is significant as indicating that Congress did not intend to allow the deduction under the personal holding company tax which it specifically provided for in Section 26(c) (1) with respect to the undistributed profits tax.

Further support for our view may be found in the Revenue Act of 1938. It was in that Act that the amendment of Section 351(b) (2) (B) [9] expressly allowing the deduction in question was rejected. Section 27(a)(4), 26 U.S.C.A.Int.Rev.Acts, page 1021[10] in providing for a corporation dividends paid credit provided that, among other things, the credit included "amounts used or irrevocably set aside to pay or to retire indebtedness of any kind", the identical language of Section 351(b) (2) (B), as amended in 1937 where it appeared as § 355(b). The section defines "indebtedness" as meaning only an indebtedness "evidenced by a bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust". Section 408, 26 U.S.C.A. Int.Rev.Acts, page 1137 [11] provided, as

---

[7] "§ 26. Credits of Corporations. In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax— * * *

"(c) Contracts Restricting Payment of Dividends. (1) Prohibition on payment of dividends. An amount equal to the excess of the adjusted net income over the aggregate of the amounts which can be distributed within the taxable year as dividends without violating a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the payment of dividends. * * * "

"§ 26. Credits of Corporations. In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax— * * *

"(c) Contracts Restricting Payment of Dividends. * * *

"(2) Disposition of profits of taxable year. An amount equal to the portion of the earnings and profits of the taxable year which is required (by a provision of a written contract executed by the corporation prior to May 1, 1936, which provision expressly deals with the disposition of earnings and profits of the taxable year) to be paid within the taxable year in discharge of a debt, or to be irrevocably set aside within the taxable year for the discharge of a debt; to the extent that such amount has been so paid or set aside. * * * "

[8] "Reg. 94, T.D. 4674, XV—2 C.B. 53 (1936). Article 26–3 (c). * * * The term 'debt' as used in section 26(c)(2) of the Act does not include an obligation of the corporation to a shareholder, as such, as distinguished from a creditor. Accordingly, amounts paid into, or set aside for, a sinking fund by a corporation for the retirement of preferred stock, pursuant to the terms of an agreement underlying the preferred stock issue, shall not be considered as set aside for the discharge of a debt. * * * "

[9] Section 405(b) of the Revenue Act of 1938, 26 U.S.C.A.Int.Rev.Acts, page 1133.

[10] "Sec. 27. Corporation dividends paid credit

"(a) Definition in general.—As used in this title with respect to any taxable year the term 'dividends paid credit' means the sum of: * * *

"(4) Amounts used or irrevocably set aside to pay or to retire indebtedness of any kind, if such amounts are reasonable with respect to the size and terms of such indebtedness. As used in this paragraph the term 'indebtedness' means only an indebtedness of the corporation * * * evidenced by a bond, note, debenture, certificate of indebtedness, mortgage, or deed of trust, issued by the corporation * * *."

[11] "Sec. 408. Meaning of terms used. The terms used in this title shall have

did Section 351(b) (4) [12] of the Revenue Act here in question, that the terms in Section 405(b) should have the same meaning as in Sections 23(b) and 27(a) (4). An amount paid to retire preferred stock according to a contract does not fulfill this definition. There is abundant reason to believe that the similar language in the Revenue Acts of 1934, 1936 and 1938 was intended to have the same meaning as changes therein were purely for clarification. Clearly, the term "indebtedness" in Section 351(b) (2) (B) of the Revenue Act of 1934 did not include an obligation to retire preferred stock pursuant to a contract.

The testimony of the lawyer who drew up the contract leads to the same conclusion. He testified that he did not feel that the new company should have a "debt with a maturing obligation". After considering the question of non-maturing debentures he "fell back on the preferred stock". The cross-examination continued as follows:

"Q. Mr. Haffenreffer did not want to have the English Company in a position where they could be a creditor and throw them into receivership? A. The business was too precarious. He did not want a debt with a date of maturity on it."

Thus, it is obvious that an orthodox debt was not contemplated, and the English company finally agreed to take preferred stock safeguarded by certain provisions which made redemption almost certain. Cf. William Cluff Co., supra. In such a situation, the following language from Hamlin v. Toledo, St. L. & K. C. RR. Co., 6 Cir., 1897, 78 F. 664, 671, 36 L.R.A. 826, seems particularly pertinent:

"Appellants say that it was originally contemplated that the new corporation should pay them for their interests in the foreclosed railroad, and, for that purpose, should issue to them its second mortgage bonds. If that plan had been carried out, there would be no doubt as to their attitude. They would have become creditors. * * * That plan was abandoned. They agreed to take, and did take, the relation of stockholders towards the new company. * * * If they intended to become creditors, and not stockholders, they adopted a most singular method of defining their relation."

■ The cases cited by the taxpayer are distinguishable. Commissioner v. Tennessee Co., 3 Cir., 1940, 111 F.2d 678, dealt with the case of promissory notes, admittedly evidences of indebtedness. The opinion below in 1939, 40 B.T.A. 154 is more enlightening as to the facts of the case than is Judge Clark's opinion and shows that the obligations in question were incurred as "debts", carried in the form of "debts", and paid as principal and interest on "debts". As for the broad interpretation of the word "indebtedness", we are not at liberty to include within its meaning situations expressly excluded by Congress. Commissioner v. Palmer, Stacy-Merrill, Inc., 9 Cir., 1940, 111 F.2d 809, involves a factual situation very similar to the instant case, but there the stock was to be retired on a fixed date whether or not there were earnings. In such case, it is a simple matter to hold that amounts paid on the stock were interest and not dividends. In the instant case there was no fixed date on which the face amount of the stock was payable out of the corporate assets regardless of earnings. Helvering v. Richmond, F. & P. RR. Co., 4 Cir., 1937, 90 F.2d 971, Commissioner v. Proctor Shop, 9 Cir., 1936, 82 F.2d 792, Commissioner v. O. P. P. Holding Corp., 2 Cir., 1935, 76 F.2d 11, and other cases are distinguishable on similar grounds.

■ Since we do not believe that the $86,400 paid by the taxpayer in 1934 to retire its preferred stock was paid to retire an "indebtedness" within the meaning of Section 351(b) (2) (B) of the Revenue Act of 1934, the deficiency of $26,329.47 was correctly assessed by the Commissioner. We find no merit in the alternative contention of the taxpayer that if the amount paid was not the retirement of an "indebtedness" it was a payment of dividends and deductible as such under Section 351(b) (2) (C). The amount was clearly paid to redeem the preferred stock and as a partial liquidation under Section 115(i) and not as a redemption in the form of a taxable dividend under Section 115(g), 26 U.S.C.A. Int.Rev.Acts, page 704. That the redemption of preferred stock is not the retirement of indebtedness is the decision of Congress. We can only enforce the statute as enacted. Foley Securities Corp. v. Commissioner, 8 Cir., 1939, 106 F.2d 731.

The decision of the Board of Tax Appeals is affirmed.

---

the same meaning as when used in Title I."

[12] See footnote 3, supra.