*Decision will be entered under Rule 50.*

KNOLLWOOD MEMORIAL GARDENS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2017-63.   Filed September 28, 1966.

*Robert E. Nelson,* for the petitioner.
*Robert M. Burns,* for the respondent.

HOYT, *Judge:* In a statutory notice of deficiency respondent determined the following deficiencies in and additions to petitioner's income tax:

| Taxable year ended Oct. 31— | Deficiency in tax | Addition to tax under sec. 6651(a), I.R.C. 1954 |
|---|---|---|
| 1958 | $2,078.99 | $519.75 |
| 1959 | 5,423.88 | 1,355.97 |
| 1960 | 769.90 | 192.48 |
| 1961 | 2,598.40 | 649.60 |

In an amendment to his answer to the petition filed herein respondent asserted increases in all of these amounts. The total asserted deficiencies and additions to tax after this amendment were as follows:

| Taxable year ended Oct. 31— | Deficiency in tax | Addition to tax, sec. 6651(a) |
|---|---|---|
| 1958 | $4,578.37 | $1,144.59 |
| 1959 | 11,239.70 | 2,809.93 |
| 1960 | 6,777.14 | 1,694.29 |
| 1961 | 5,570.57 | 1,392.64 |
| Total | 28,165.78 | 7,041.45 |

The issues for decision are:

(1) Whether the petitioner is entitled to exemption under sections 501(a) and 501(c)(13), I.R.C. 1954 as a "not for profit" cemetery organization.

(2) Whether the petitioner is entitled to deduct as "cost of land" amounts paid under an October 30, 1957, "Land Purchase Agreement," or whether such amounts represent nondeductible distributions to equity interests.

(3) Whether the petitioner's failure to file Corporation Income Tax Returns, Form 1120, was due to reasonable cause rather than willful neglect, and whether the petitioner is liable for the addition to the tax provided by section 6651(a), I.R.C. 1954.

(4) Whether the Return of Organization Exempt from Income Tax, Form 990, filed by the petitioner for its fiscal year ended October 31, 1958, was a sufficient return to start the running of the statute of limitations, so as to bar the Commissioner from assessing any tax liability for that year.

### FINDINGS OF FACT

The parties have stipulated some of the facts. Their stipulation and the several exhibits attached thereto are incorporated herein by this reference.

All statutory references hereinafter are to the Internal Revenue Code of 1954 unless otherwise indicated.

Petitioner is a cemetery association, organized on October 29, 1957, under chapter 157 of the 1955 Wisconsin Statutes, with its principal office in Manitowoc, Wis. Under said chapter 157 of the 1955 Wisconsin Statutes a cemetery association is referred to as and given the powers of a corporation. Petitioner employed a fiscal year ending on October 31. For each of the fiscal years ending October 31, 1958, 1959, and 1960, it filed a Return of Organization Exempt from Income Tax, Form 990, with the district director of internal revenue, Milwaukee, Wis. No return was filed for the fiscal year ending October 31, 1961.

766

Robert Petitjean is a lawyer residing and practicing his profession in Green Bay, Wis. Petitjean was the attorney who organized the petitioner cemetery in 1957; he presently serves as petitioner's president and general manager and has so served ever since petitioner was organized. Petitjean had done the legal work in the organization of at least one other cemetery, and at all times here pertinent was thoroughly familiar with Wisconsin cemetery operations, including the method of land acquisition of numerous other Wisconsin cemeteries similar to petitioner. He was also familiar with court decisions involving Federal income tax questions involving cemetery operations such as petitioner's.

On September 30, 1957, Petitjean acquired an option from Henry and Alma Hougen to acquire "for the purpose of establishing and developing a cemetery" a 20-acre tract of farmland near Manitowoc, Wis., then owned by the Hougens.

On October 29, 1957, the petitioner corporation was organized. The following day, October 30, 1957, petitioner and the Hougens entered into a purported land purchase agreement covering the 20-acre tract which the Hougens had previously optioned to Petitjean. This contract provided that the Hougens would convey the land to petitioner and that they would thereafter "provide for the original survey and plat of the area for the first garden" and "provide the necessary engineering, planning and construction for the first garden, together with plans for future development of the area to be conveyed."

As its part of the contract petitioner agreed to pay to the transferors *or their assigns* 20 percent of the proceeds derived by petitioner from the sale of interment spaces in the cemetery to be developed. The land purchase agreement contained, *inter alia*, the following pertinent provisions:

CONTRACTUAL CLAUSE

Now, therefore, in consideration of the mutual covenants and agreements herein expressed and the reciprocal obligations hereby mutually undertaken, the Owners agree to convey to the Association the said lands hereinbefore described and to pay for the obligations incurred or to be incurred in connection with the original survey of said lands, the preparation and filing of a plat of the area including a plat of the first garden within the area to be conveyed, and the Association in consideration thereof hereby covenants and agrees to pay Henry Hougen and Alma Hougen, his wife, or their assigns, their heirs and representatives, for and in behalf of them and as trustee for *other investors* represented by them, out of the proceeds of the sale of lots, burial spaces or other interment spaces within the area of said lands described above, Twenty (20%) per cent of the gross proceeds derived from the sale of interment spaces within said area less sums paid therefrom into the permanent or perpetual care and improvement fund, as received by it from spaces sold to persons acquiring burial rights within the area of said cemetery. [Emphasis supplied.]

For purposes of interpretation and fixing of a rule or formula for accounting purposes, it is mutually agreed:

1. That the gross sales price of interment spaces sold from time to time within the area of said cemetery shall be determined to be the price for which the space is sold either for cash or on an installment basis;

2. That Fifteen (15%) per cent of such price as received from a purchaser shall be first set aside to be paid over to a permanent or perpetual care or improvement fund to be established for said cemetery, the sum so paid over to be placed in trust with a trustee for the purposes set forth in the Trust Agreement so established;

3. After deducting the sum to be paid over into said Permanent or Perpetual Care and Improvement Fund, the remaining sum from each sale shall be deemed to be the base sales price, on which Twenty (20%) per cent of the gross proceeds from the sale of interment spaces is based, to discharge and pay the obligation of the Association to the said Henry Hougen and Alma Hougen, his wife, or their assigns;

The payments so to be made shall commence as of the date of the first burial space sold in said cemetery and shall continue to be so paid for a period of Twenty (20) years after the last contract of a sale of burial space in said area shall have matured and paid for in full.

## ASSIGNMENT

It is understood and agreed by and between the parties hereto that it is the intention of the Owners or parties of the first part to assign all of their right, title and interest in and to this agreement to Robert Petitjean of Green Bay, Wisconsin. The Association does hereby consent to such assignment and on the execution thereof do agree that said assignment shall operate as a full and complete novation of the parties of the first part herein referred to as the Owners and it shall relieve the Owners from all personal obligations hereunder on their part to be performed and from all personal liability whatsoever, and said assignee shall assume all such obligations in their stead.

## TRANSFER OF TITLE

It is understood and agreed that the title to said lands is so transferred to the Association on the covenant and agreement on the part of the Association to pay for said lands, surveys, expenses and services according to the terms herein set forth.

As monies are received from lot sales, the Association shall establish a special account earmarked for the payment of its obligation created hereby and out of the proceeds apply the same in reduction of said obligation, and pay over to said Owners or their assigns individually and as trustee for said *investors*, the proportional share of all sums so received by the Association, within One (1) week after the receipt of such funds by the Association. [Emphasis supplied.]

## CONSIDERATION

In consideration of said covenants and agreements on the part of the Association, the Owners have transferred and delivered to the Association, subject to the terms hereof, the lands heretofore described and provided the expenses and services, incident to the agreements herein contained, and the Association named herein has issued this obligation as evidence of its indebtedness and promise to pay said obligation according to the terms set forth herein.

## LAND PURCHASE FUND

It is further agreed that the within named Association, in consideration hereof and in consideration of the lands described herein, does further covenant and agree *to pay said obligation to said Owners or their assigns, individually and as Trustee for their said investors* and each of their respective heirs, representatives and assigns, the said sum as hereinbefore defined out of lot sales or other interment spaces, sold during the term hereof and *deduct the same from its net proceeds from said sale, after payment of all sales expense incident to such sale or sales.* [Emphasis supplied.]

It is mutually agreed that the obligation created hereby shall be construed to be and deemed to be the Land Purchase Fund established by the Association and it shall constitute the full but deferred purchase price, without interest for said lands and other benefits so acquired and that said fund and the sum or sums from time to time paid over, from the sale of interment spaces within the confines of said lands, shall be the sole source of payment by the said Association to pay for said obligation, subject, however, to the stipulations hereafter set forth and upon the application of the monies from such source the liability of the Association to pay said obligation shall cease and terminate.

It is also mutually agreed that until the monies to be applied to said obligation shall have been paid over to the said Owners or their assigns, any amount found due shall be and remain a lien on the premises heretofore described in favor of said Owners, their heirs, representatives and assigns, without priority of interest.

It is further agreed that the liability of the Association for the discharge of said obligations shall be and they are limited to the extend [sic] of its Land Purchase Fund, and is secured by a lien on the said premises only as hereinafter set forth.

It is further agreed that said Land Purchase Fund shall consist of Twenty (20%) per cent of the base sales price as heretofore defined for each grave space or other interment spaces sold and the percentage of the base sales price of each such space sold shall in each case (exclusive of sums paid over into a Permanent Care and Improvement Fund) represent the price to be paid hereunder.

The unpaid portion of said percentage on lot sales shall, until paid, be a direct lien upon the unpaid sales price of the space sold, until the Association has paid the full percentage of the base sales price for each space sold.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### REMITTANCE

Commencing one week after the receipt of available monies from the first sale of an interment space in said cemetery, the Association shall pay to the said Owners or their assigns, as aforesaid, the percentage to which they are entitled to receive; like sums shall be paid to them each week thereafter during the entire period of this agreement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

### DURATION

It is understood and agreed that this agreement shall remain in full force and effect from the date hereof for a period of Twenty (20) years after the date of full payment of the last sale within such period and thereafter until all monies unaccounted fro [sic] by the Association shall have been fully paid.

On the same date, October 30, 1957, the Hougens assigned their interest in said land purchase agreement to Robert Petitjean. The written contract of assignment contained the following clauses:

WHEREAS, We, HENRY HOUGEN and ALMA HOUGEN, his wife, for valuable consideration on the 30th day of September 1957, executed and gave to Robert Petitjean an option to purchase the above-described real estate for the purpose of establishing and developing a cemetery on said property; and

WHEREAS, the said option was exercised by the said Robert Petitjean on the 30th day of October, 1957, by the payment of _____ (*$1750.00*) DOLLARS *as the first payment on an installment sale of said property* and a warranty deed conveying said property was executed and tendered by the said Henry Hougen and Alma Hougen, his wife, to the Knollwood Memorial Gardens Association, as grantee of said property, and a note and mortgage on the North One-half (N ½) of the said property was executed and tendered to the said Henry Hougen and Alma Hougen, his wife, by the said cemetery association to secure the payment of the balance of the purchase price; and

WHEREAS, *said deed of conveyance of the above-described property should have named Robert Petitjean as grantee;* and

WHEREAS, the said Henry Hougen and Alma Hougen entered into a Land Purchase Agreement with the said Knollwood Memorial Gardens Association by a written instrument dated October 30, 1957 whereby and under the provisions of which the said Knollwood Memorial Gardens Association gave to the said Henry Hougen and Alma Hougen, his wife, Twenty (20%) per cent of the proceeds of the base price of all grave spaces sold in said cemetery for a period of Twenty (20) years, in consideration of the conveyance of the said property to the said Knollwood Memorial Gardens Association for cemetery purposes; and

WHEREAS, said Land Purchase Agreement specifically provided for the assignment of all the right, title and interest that said Henry Hougen and Alma Hougen, his wife, may have in and pursuant to said agreement, with the consent of the said Knollwood Memorial Gardens Association;

Now, THEREFORE, in consideration of Robert Petitjean's discharging and releasing Henry Hougen and Alma Hougen, his wife, from any and all claims, demands and causes of action that he may have had or may have in the future by reason of his rights under his option to purchase said property, and in further consideration *of Robert Petitjean's assuming the obligation for and promising to pay the balance of the purchase price of said property for and on behalf of the said Knollwood Memorial Gardens Association,* we, Henry Hougen and Alma Hougen, his wife, hereby assign all our right, title and interest in and to the said Land Purchase Agreement dated October 30, 1957 with the Knollwood Memorial Gardens Association, together with all monies due, or that may become due thereunder.

And the assignors undersigned hereby appoint the assignee, Robert Petitjean, to be their true and lawful attorney, irrevocably, for them and in their name and stead to receive and hold absolutely in his own name and right all benefits and rights and assume and carry out and perform all acts and obligations under the provisions of said Land Purchase Agreement.

[Emphasis supplied.]

Including the $1,750 downpayment recited in the above-quoted assignment, Petitjean paid to the Hougens a total of $6,000 within 1 or 2 years after the execution of that agreement. At the

date of acquisition (Oct. 30, 1957) the fair market value of the 20 acres of land acquired by petitioner in the above-described transaction was $6,000.

The petitioner acknowledged the assignment by means of a document entitled "Agreement of Confirmation of Land Purchase Agreement" also dated October 30, 1957. This was executed and acknowledged by Petitjean and petitioner and provided in part as follows:

WHEREAS, a certain land purchase agreement was executed by and between Henry Hougen and Alma Hougen, his wife, and the Knollwood Memorial Gardens Cemetery Association on the 30th day of October, 1957, which said agreement was thereafter assigned by Henry Hougen and Alma Hougen, his wife, to Robert Petitjean; and,

WHEREAS, said original land purchase agreement by and between Henry Hougen and Alma Hougen, his wife, and the Knollwood Memorial Gardens Cemetery Association was made and entered into by the Parties thereto with the strict understanding and provision for the assignment of the same to Robert Petitjean of Green Bay, Wisconsin and the Knollwood Memorial Gardens Cemetery Association therein consenting to such assignment as a full and complete novation of the parties contained therein;

Now THEREFORE in consideration of the assignee and party of the first part herein [Robert Petitjean] assuming the obligation for and promising *to pay the balance of the purchase price of the said property* for and on behalf of the said Knollwood Memorial Gardens Cemetery Association to the said Henry Hougen and Alma Hougen, his wife, of the Town of Kossuth, Manitowoc County, Wisconsin; and in further consideration of the mutual promises and covenants contained in the assignment by and between Henry Hougen and Alma Hougen, his wife, to Robert Petitjean in the Agreement of Assignment dated October 30, 1957 by and between said parties and in further consideration of the mutual covenants and promises by and between the parties, Henry Hougen and Alma Hougen, his wife, and the Knollwood Memorial Gardens Cemetery Association contained in the land purchase agreement by and between the said parties dated October 30, 1957, the obligations of Henry Hougen and Alma Hougen, his wife, contained in each of the said agreements being assumed by the said assignee and party of the first part herein, Robert Petitjean; [Emphasis supplied.]

The said Knollwood Memorial Gardens Cemetery Association, party of the second part herein, hereby reaffirms and confirms the said agreement of assignment by and between the said Henry Hougen and Alma Hougen, his wife, of the Town of Kossuth, Manitowoc County, State of Wisconsin, to Robert Petitjean, the assignee and party of the first part herein, and obligates the said party of the second part, the Knollwood Memorial Gardens Cemetery Association to the said Robert Petitjean in the place and stead of Henry Hougen and Alma Hougen, his wife, as a *complete novation of the parties thereto* under the provisions of the original land purchase agreement by and between Henry Hougen and Alma Hougen, his wife, and the Knollwood Memorial Gardens Cemetery Association dated October 30, 1957.

On October 29, 1957, the day petitioner was organized and the day prior to the execution of the purported land purchase agreement, the assignment to Petitjean, and the agreement of confirmation, and in obvious anticipation of the rights he was to receive, Petitjean sold and transferred a one-fourth interest in the October 30, 1957, land purchase

agreement to H. E. Majeski for $10,000. On the same date, Petitjean also transferred a second one-fourth interest in the October 30, 1957, land purchase agreement to Bernard J. Bertrand for services to be rendered. The parties have stipulated as follows with respect to these transactions:

On October 29, 1957, Robert Petitjean sold a ¼ interest in the October 30, 1957 "Land Purchase Agreement" to Dr. H. E. Majeski for $10,000, payable out of the first money received under the "Land Purchase Agreement".

On October 29, 1957, Robert Petitjean transferred a ¼ interest in the October 30, 1957 "Land Purchase Agreement" to Bernard J. Bertrand for services to be rendered. Mr. Bertrand was Mr. Petitjean's law partner from January 1, 1958 through September, 1961. In March or April of 1960, Mr. Bertrand transferred back to Mr. Petitjean the ¼ interest in the "Land Purchase Agreement" in return for a transfer to Mr. Bertrand of a similar ¼ interest which Mr. Petitjean had held in a similar enterprise, originated by Mr. Bertrand.

In a letter dated September 28, 1959, to the Internal Revenue Service explaining the landshare arrangements and the Majeski participation and interest, Petitjean, writing on behalf of petitioner as its president, explained as follows:

The sum of $10,000.00 was received from Dr. H. E. Majeski for the return of one-fourth of the land share or, in other words, one-fourth of the 20% that I, Robert Petitjean, was to receive from the Association. It also was further agreed that he was to receive his money out of the 20% before any other money was received by any land share holders. This was a separate agreement between myself, Robert Petitjean, and Dr. Majeski and actually had nothing to do with the Cemetery Association. * * *

Petitioner was created on October 29, 1957, upon the execution by seven "organizers" of a document entitled "Certificate of Knollwood Memorial Gardens." This document is comparable in nature and purpose to the certificate or articles of incorporation of a typical business corporation. It provides that "the management and the affairs of the Cemetery shall be vested in a Board of Six Trustees." The trustees are to be elected by vote of all persons of legal age who own a lot or fractional part of a lot in the cemetery. Two trustees are elected each year to serve 3-year terms. The original six trustees were chosen by the seven persons who were petitioner's "organizers." The following is a schedule of the petitioner's trustees during the taxable years here involved:

| Individuals | Year ended Oct. 31— | | | |
|---|---|---|---|---|
| | 1958 | 1959 | 1960 | 1961 |
| H. E. Majeski | | | x | x |
| Virginia Majeski | | | x | x |
| Robert E. Koutnick | x | | | |
| Elva Koutnick | x | | | |
| Bernard J. Bertrand | x | x | | |
| Helen M. Bertrand | x | x | | |
| Robert Petitjean | x | x | x | x |
| Patricia Petitjean | x | x | x | x |
| George Ziegelbauer | | x | x | x |
| Leona Ziegelbauer | | x | x | x |

Petitioner's officers during the taxable years here involved were Robert Petitjean, president, and Patricia Petitjean, secretary and treasurer. Robert Petitjean served as petitioner's overseer and general manager during this period.

On October 30, 1957, the day after its organization, the only asset of the petitioner was the 20-acre tract of land described above, and Petitjean's obligation to finance initial development of the cemetery; its only liability was the obligation it had to Petitjean under the land purchase agreement. After platting and development of the tract into a cemetery there would be approximately 17,000 burial lots available for sale in Knollwood Memorial Gardens. During the years here in question petitioner sold approximately 3,962 cemetery lots as follows:

| Fiscal year ending Oct. 31— | Approximate number of lots sold |
|---|---|
| 1958 | 946 |
| 1959 | 1,413 |
| 1960 | 1,173 |
| 1961 | 430 |

It is petitioner's policy to sell off only approximately one-half of the available cemetery lots in a particular garden and to retain the other one-half for sales to relatives of persons who already own lots in that garden. During the years in question lots were sold on a "preneed" basis for $75 each. The asking price for "need" lots was $150, but no lots were sold on a "need" basis during this period.

During the years in question petitioner paid the following amounts to the "landshare holders"[1] under the provisions of the October 30, 1957, land purchase agreement:

| Fiscal year ending Oct. 31— | Amount paid |
|---|---|
| 1958 | $8,331.26 |
| 1959 | 14,112.12 |
| 1960 | 20,024.14 |
| 1961 | 9,907.25 |
| Total | 52,374.77 |

Petitioner's Return of Organization Exempt From Income Tax (Form 990) for the fiscal year ending October 31, 1958, was filed on March 11, 1959. Subsequently, petitioner executed a waiver of the statutory period for assessment (Form 872), thereby extending the statutory limitation period for assessment of deficiency to December 31, 1962. The statutory notice of deficiency which gave rise to the

[1] The term "landshare holders," originally used by petitioner and later employed by both parties in their pleadings and briefs will be used hereinafter for convenience in terminology. The term has reference to the individuals who, collectively, are to receive 20 percent of the sales price of all lots sold, pursuant to the Oct. 30, 1957, land purchase agreement. During the years here in question these persons were Robert Petitjean, the assignee of the alleged entire original interest of Henry and Alma Hougen, and H. E. Majeski and Bernard J. Bertrand, both assignees of one-fourth interests from Petitjean.

instant proceeding, covering the fiscal years 1958 through 1961, was issued on February 28, 1963.

On the same day it submitted its Form 990, Exempt Organization Return, for fiscal 1958, its first year of operation, petitioner submitted an exemption application, Form 1026. These two forms were accompanied by a letter dated March 13, 1959, from Robert Petitjean which contained, *inter alia*, the following statements:

You will note on Form 990 that the land owned by the cemetery was purchased in the amount of $6000.00 and I had the land appraised by Mr. Ray F. Daul and I am enclosing a letter regarding his appraisal of this property. * * * *The land was purchased from Henry Hougen in October, 1957 for the amount of $6,000.00.* Mr. Hougen is not an incorporator or an officer or on the Board of Directors of the Knollwood Memorial Gardens Association.

*     *     *     *     *     *     *

The expense listed as land shares represents *a return to the investors* in the Knollwood Memorial Gardens Association.

[Emphasis supplied.]

The Form 990 itself showed that land and cemetery improvements held by petitioner at the end of the year (Oct. 31, 1958) were assets with a total value of $6,520.43.

In subsequent communications, dated as indicated below, with the Exempt Organizations Branch of the Internal Revenue Service, Petitjean made the following statements, *inter alia*, on behalf of petitioner:

*September 28, 1959*

In reply to your letter received September 11, 1959, I wish to state that the cemetery property was deeded from Henry and Alma Hougen to Knollwood Memorial Gardens in October 1957. Henry and Alma Hougen agreed to give this land to the cemetery free of charge and also to develop the first Garden, pay for the first memorial and to develop the roads for the first garden. In consideration of the Hougens doing that, the Cemetery Association agreed to give them 20% of the gross proceeds derived from the sale of interment spaces within the area, less sums to be paid in the perpetual care fund. Later, in November of 1957, this land purchase agreement was assigned from the Hougens to me, Robert Petitjean, and as a further part of the agreement, *I agreed not only to do all of the things that the Hougens had agreed to do, but further agreed to pay the Hougens $6000.00 for the area that they had given to the Cemetery Association.* This agreement was confirmed by the Board of Directors of the Cemetery Association. *After I had received the assignment of this land purchase agreement from the Hougens, I went out and sold land shares in order to obtain money to develop said cemetery in order to fulfill my part of the land purchase agreement.* * * *

The land share is nothing else but a contract stating the fact that I, Robert Petitjean, had a land purchase agreement with the Cemetery Association and that I was to receive 20% of the sales of said lots and that *in consideration of the amount of money contributed by a land share holder, that he would receive a certain percentage of the land share. The land share holders would not receive any interest on this money contributed by them. Only and when any lots were sold* by the Association and the 20% received by Mr. Petitjean, *only and at that time would any of the land share holders receive any money on their investment. If no money was received through this assignment of the*

*land purchase agreement, then and in that case, the land share holders would receive nothing.*

March 9, 1961

In reply to your letter dated November 4, 1960 I am enclosing herewith our tax return for the year ending October 30, 1960.

\*          \*          \*          \*          \*          \*          \*

In regard to No. 3 I wish to state that the 20 acres of the cemetery has been developed and there are approximately 18,000 lots. The amount sold in the fiscal year 1958 was approximately 946 lots, the fiscal year 1959 shows 1,413 sold and the year 1960 shows 1,173 sold.

In regard to No. 4 of your letter I wish to state that you have in your hands the original contract whereby Harry Hogan [sic] and his wife agreed to develop one Garden and to give the land, which was approximately $6,000.00, to the Knollwood Memorial Gardens Association in consideration of receiving in return 20% of the gross profits. You also have in your hands the statement of that agreement from Mr. Hogan [sic] and his wife to Mr. Petitjean. At the time that Mr. Hogan [sic] signed this contract to Mr. Petitjean Mr. Petitjean paid to Mr. Hogan [sic] the sum of $6,000 for the land and then further proceeded to perform the acts of Mr. Hogan [sic] to the Knollwood Memorial Gardens Association.

In regard to the 20% to be received on the sale of each lot by Mr. Petitjean I wish to state that Mr. Petitjean then divided up his interest in this 20% contract by selling one-fourth of the 20% that he was to receive to Dr. H. Majeski for the sum of $12,000.00. I think that should clearify [sic] your questions in item No. 4.

[Emphasis supplied.]

After an extended exchange of communications, respondent ruled on April 21, 1961, that petitioner did not "qualify for exemption as an organization described in section 501(c)(13) of the Code," and that petitioner was "required to file income tax returns Form 1120, annually, with the District Director of Internal Revenue, Milwaukee, Wisconsin."

From petitioner's books and records and with the assistance of Petitjean, an internal revenue agent was able to prepare substitutes for returns on U.S. Corporation Income Tax Return blanks, Form 1120, for petitioner's fiscal years ending October 31, 1958, 1959, 1960, and 1961, which substitutes were all filed on September 14, 1962.

The notice of deficiencies here involved determined that petitioner did not qualify as an organization exempt from taxation under section 501, I.R.C. 1954, for the years 1958 through 1961, and asserted penalties under section 6651(a) for petitioner's failure to file income tax returns. By amended answer, respondent claimed increased deficiencies and additions to tax resulting from the denial of deductions for landshare holder expenses, as follows:

| Fiscal year ending Oct. 31— | Landshare holder expense |
|---|---|
| 1958 | $8,331.26 |
| 1959 | 14,112.12 |
| 1960 | 20,024.14 |
| 1961 | 9,907.25 |

The parties have, *inter alia*, stipulated as to the following additional facts:

The transferors' basis in the land transferred to the petitioner under the October 30, 1957 "Land Purchase Agreement" totals $13,520.50, consisting of $6,000.00, initial cost of the land, plus $7,520.50, cost to develop the first garden in fulfillment of the development obligation assumed under the "Land Purchase Agreement". The development costs were comprised of: road expense—$2,000.00, landscaping expense—$3,136.50, cost of monument—$1,774.00, engineer's fee—$500.00, miscellaneous expenses—$110.00.

If it is determined that the petitioner should take the transferors' basis in the land transferred to the petitioner under the October 30, 1957 "Land Purchase Agreement", such amount would be allocable to the proceeds from lots sold during the fiscal years ending October 31, 1958, October 31, 1959, October 31, 1960 and October 31, 1961, as follows:

| Fiscal year ending Oct. 31— | Allocated transferors' basis |
| --- | --- |
| 1958 | $1,161.97 |
| 1959 | 1,909.43 |
| 1960 | 1,265.96 |
| 1961 | 672.35 |

### FINDINGS OF ULTIMATE FACTS

At the time it filed its Exempt Organization Return, Form 990, for its fiscal year ended October 31, 1958, petitioner had determined in good faith that it was a tax-exempt organization.

Petitioner's failure to file required Form 1120, Corporation Income Tax Returns, for all of the years here involved was not due to reasonable cause.

Petitjean acquired the real property in question from the Hougens for $6,000. He had the land deeded directly to petitioner by the Hougens and petitioner agreed that in consideration of this transfer and of Petitjean's agreement to bear the expense of developing the first garden, $7,520.50, Petitjean would be paid 20 percent of the proceeds derived from the sale of grave spaces for an indeterminate period of years until all lots were sold and paid for. These were all prearranged and simultaneous transactions and parts of an integrated plan. It was not contemplated or intended that the Hougens would develop the cemetery or receive a percentage of future lot sales.

Petitioner was not organized, owned, or operated exclusively for the benefit of its members; it was organized and operated for profit with a substantial profit going annually to the holders of the so-called landshares as lots were sold; large parts or portions of its net earnings annually were paid over to Petitjean and those who shared his 20 percent of grave sales proceeds computed pursuant to the so-called land purchase agreement.

The amounts paid by petitioner each year to Petitjean and the other so-called landshare holders were not paid to acquire land, nor were

they part of land cost; they were returns to the payees on their investment in the cemetery venture or distributions on equity interests in Knollwood Memorial Gardens.

OPINION

With respect to the principal issue here, the exempt status of petitioner, petitioner contends that the instant case is indistinguishable from *Commissioner* v. *Kensico Cemetery*, 96 F. 2d 594 (C.A. 2, 1938), affirming 35 B.T.A. 498 (1937); that petitioner, a nonprofit cemetery association, qualifies as an exempt corporation under sections 501(a) and 501(c) (13) of the 1954 Code,[2] under each test laid down by the statutes as interpreted by *Kensico*, and that only "profit corporations" authorized to issue stock are taxable if they are cemetery companies.

Respondent argues that petitioner is not exempt under sections 501(a) and 501(c) (13) of the Code because it is not operated exclusively for the benefit of its members, and because it is operated for profit and a portion of its net earnings inures to the benefit of private shareholders or individuals. On the evidence of record we agree with respondent.

Robert Petitjean was a lawyer, practicing his profession and residing in Green Bay, Wis., in 1957. He became involved in and familiar with the organization and operation of Wisconsin cemetery corporations and made a study of the applicable statutory and case law with respect to establishing a cemetery, acquiring land therefor and acquiring tax-exempt status for Federal income tax purposes. Petitjean decided that the Manitowoc, Wis., area was in need of further cemetery facilities.

On September 30, 1957, he obtained an option to purchase 20 acres of farm land near Manitowoc, over 30 miles distant from Green Bay, from Henry and Alma Hougen. This option was apparently in writing, because it is referred to in documentary evidence of record as having been executed by the Hougens, but no copy thereof was introduced in evidence at trial.

---

[2] SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

    (a) EXEMPTION FROM TAXATION.—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.

    *       *       *       *       *       *       *

    (c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

    *       *       *       *       *       *       *

        (13) Cemetery companies owned and operated exclusively for the benefit of their members or which are not operated for profit; and any corporation chartered solely for burial purposes as a cemetery corporation and not permitted by its charter to engage in any business not necessarily incident to that purpose, no part of the net earnings of which inures to the benefit of any private shareholder or individual.

Petitjean thereafter prepared the necessary legal forms and papers to organize a cemetery corporation under chapter 157 of the 1955 Wisconsin Statutes, and on October 29, 1957, Knollwood Memorial Gardens was organized as a cemetery association under chapter 157. At that time and in the organization meeting on October 29, a board of six trustees was duly elected. Petitjean and his wife, Patricia Petitjean, were both elected trustees for 3 years, and Bernard J. Bertrand, Petitjean's sometime law partner, and his wife, Helen, were elected trustees for 2 years. A board of six trustees was fixed and provided for under the certificate of incorporation, by the board in its first meeting and under the Knollwood bylaws. From the outset, Petitjean served as petitioner's president and general manager, and Patricia Petitjean was petitioner's secretary.

On the day Knollwood was organized, October 29, 1957, Petitjean sold a one-fourth interest, in his anticipated rights under the purported Land Purchase Agreement, not then executed by the parties thereto, for $10,000. He transferred a second one-fourth interest therein that day to Bertrand "for services to be rendered." At that time Petitjean held the option granted by the Hougens a month before to purchase their 20 acres of land. Also, at that time, Knollwood had no assets and no liabilities.

On the following day, October 30, 1957, Henry and Alma Hougen and Knollwood executed the land purchase agreement under which Knollwood acquired the 20 acres of farm land. This agreement specified that the Hougens convey the described lands, "and at either their cost and expense or at the cost and expense *of their assigns*" (emphasis added) provide for an original survey and plat of the first garden and other developmental work. In return Knollwood agreed to pay to the Hougens, "*or their assigns*, their heirs and representatives, for and in behalf of them *and as trustee for other investors represented by them*" (emphasis added) out of the proceeds of the sale of lots, 20 percent of the gross amount realized, with adjustment for 15 percent to be first set aside from the gross sales price of each lot for perpetual care. Immediately following this so-called "Contractual Clause," which was to commence as of the first lot sale and continue for 20 years "after the last contract of a sale of burial space in said area shall have matured and paid for [sic] in full," the following provision appears:

### ASSIGNMENT

It is understood and agreed by and between the parties hereto that it is the intention of the Owners or parties of the first part to assign all of their right, title and interest in and to this agreement to Robert Petitjean of Green Bay, Wisconsin. The Association does hereby consent to such assignment and on the execution thereof do agree that said assignment shall operate as a full and complete novation of the parties of the first part herein referred to as the Owners and it shall relieve the Owners from all personal obligations hereunder on their

part to be performed and from all personal liability whatsoever, and said assignee shall assume all such obligations in their stead.

As anticipated, arranged, contemplated, and intended the assignment followed immediately "as the night the day" by written document dated and acknowledged by the Hougens on the same day, October 30. This assignment recites the giving of the option to purchase the Hougens' land to Robert Petitjean on September 30, 1957, for the purpose of developing a cemetery, and that Petitjean exercised it on October 30 by paying $1,750 "as the first payment on an installment sale of said property." To qualify as an *installment sale* under section 453 of the Code, the Hougens could not have received more than 30 percent of the selling price in the year of sale, so that the most that could have been paid on a $6,000 sale was $1,800 to qualify for installment reporting.

The assignment also sets forth that the Hougens deeded the property to Knollwood and took back a note and mortgage on the north one-half of the property to secure "payment of the balance of the purchase price," and that the deed should have run to Petitjean as grantee instead of Knollwood. The note and mortgage were not produced at trial or introduced in evidence.

After reciting further that the Hougens and Knollwood had entered into the land purchase agreement of that date to give the Hougens' 20 percent of the proceeds of grave spaces sold and that this agreement "specifically provided for the assignment" of the Hougens' interest thereunder, the assignment then provided for the transfer to Petitjean of those interests, in consideration of the release of his rights under the option to purchase the property and his assumption of the obligation "to pay the balance of the purchase price of said property for and on behalf of" Knollwood.

Finally, and again immediately following on the same day, the last document to complete the arrangement was executed by Petitjean and Knollwood: "Agreement of Confirmation of Assignment of Land Purchase Agreement." This document recited the several steps taken earlier the same day, and provided that in consideration of Petitjean's assumption of "the balance of the purchase price of the said property" to the Hougens, etc., etc., Knollwood reaffirmed and confirmed the assignment and obligated itself to Petitjean instead of the Hougens, "as a complete novation of the parties thereto under the provisions of the original land purchase agreement."

The result and net effect of all of these simultaneous transactions was that the Hougens received a downpayment of $1,750 (almost exactly 30 percent of $6,000) from Petitjean, who had the option to buy their land, "as the first payment on an installment sale" of their farm tract. They held a note and mortgage from Knollwood, to which the property was deeded, "to secure the payment of the balance of the

purchase price" which was assumed and paid by Petitjean. The total amount paid to the Hougens for their land was $6,000, the balance of $4,250 "of the purchase price" having been paid to them by Petitjean, as our findings of fact reflect, within a year or two. The evidence before us just does not support petitioner's contention that the purchase price of the land and the Hougens' alleged promise to develop the first garden was 20 percent of the proceeds to be derived from the sale of graves for 20 years. If this had been "the purchase price" as petitioner now urges, Petitjean would have been obligated to pay the balance of the 20 percent over the years to the Hougens after deducting the $1,750 downpayment, since he specifically agreed to pay "the balance of the purchase price." Obviously, this was not the contractual arrangement. The purchase price of the land was $6,000 and the balance due the Hougens was $4,250, which was all Petitjean paid them.

We conclude and hold that when the smokescreen and window dressing is stripped aside, Petitjean paid the Hougens $6,000 for their land which he had deeded directly to petitioner. In return for the land and Petitjean's obligation to finance the development of the first garden, Knollwood obligated itself to pay him 20 percent of the proceeds from subsequent grave-space sales for 20 years plus. The payments thereafter made by petitioner to Petitjean and the other "investors" to whom he had anticipatorily transferred slices of the pie were in no sense land costs or payments, the entire land cost being merely $6,000, the then fair market value of the farmland acquired. It is obvious that the Hougens were perfectly willing to sell their land for $6,000, in an "installment sale" with less than 30 percent, $1,750, paid down at closing and the balance, evidenced by note secured by mortgage, paid off in a year or two thereafter by Petitjean who assumed the obligation. This is exactly what was done.

Petitioner argues that the Hougens sold their land and their promise to develop the first garden at their expense to it for 20 percent of future grave-sale proceeds and that Petitjean in turn paid the Hougens $6,000 for their rights under the land purchase agreement. The evidence before us is convincing that Petitjean paid the Hougens $6,000 for their land which he had deeded to petitioner.

We must next consider the effect of petitioner's simultaneous agreement with Petitjean to pay him a percentage of future grave sales for a period of many years in return for this $6,000 worth of land and his agreement to pay the development expenses for the first garden, found to be $7,520.50. It is clear that at this time petitioner acquired property and an obligation of Petitjean with a then total value of $13,520.50 for both assets in exchange for 20 percent of future proceeds from grave sales for over 20 years. Petitioner's sole assets at this time were the land and Petitjean's development expense obliga-

tion, and its only liability was its agreement to pay Petitjean 20 percent of lot sales proceeds for the prescribed period of years. As our findings of fact disclose, payments of the 20-percent split to the Petitjean group in the years before us were as follows:

*Fiscal year*

| | |
|---|---|
| 1958 | $8, 331. 26 |
| 1959 | 14, 112. 12 |
| 1960 | 20, 024. 14 |
| 1961 | 9, 907. 25 |
| Total, first 4 years | 52, 374. 77 |

In *Sherwood Memorial Gardens, Inc.*, 42 T.C. 211 (1964), affd. 350 F. 2d 225 (C.A. 7, 1965), the question was whether the land transferors, the holders of so-called certificates of indebtedness, actually had in substance an equity interest in the cemetery corporation, petitioner therein, so that payments to them out of the proceeds of lot sales would be regarded as dividend distributions by the cemetery rather than deductible cost of lots sold. There two individuals purchased 30 acres of land for $30,000, each contributing one-half of the necessary funds, and deeded it to a cemetery corporation pursuant to an agreement made the same day under which they were issued a certificate of indebtedness for 25 percent of the base sales price of each burial space sold in the cemetery for 15 years. In the 3 years following the so-called sale, the taxpayer deducted payments made to certificate holders as cost of land; these deductions were disallowed by the Commissioner who determined that the payments were distributions made with respect to equity capital and not land costs. The petitioner there was a business corporation authorized to issue stock, but the individuals who held the certificates were not stockholders. We held that the certificates were instruments evidencing a proprietary equity interest in the nature of preferred stock, notwithstanding the fact that the holders thereof were not shareholders of record and the corporation was not authorized by its charter to issue preferred stock. We see no need to restate here the reasons we gave therein for reaching that conclusion. The facts in the instant case dictate a similar result. We cannot view the obligations of petitioner to Petitjean as debt owed for land purchased nor can we conclude that the so-called landshare payments were costs of lots sold. See also *Gardens of Faith, Inc.*, 345 F. 2d 180 (C.A. 4, 1965), affirming a Memorandum Opinion of this Court.

Despite the fact that the land purchase agreement which created the interests of the landshare holders is couched in terms of purchase and sale, and in form appears to make the transferor of the land a creditor, virtually none of the elements of a true debt are present. There was no unconditional promise to pay; payment was contingent upon future

sales by the alleged "debtor." There was no fixed date of maturity; petitioner's obligation continued for an undeterminable period of time.[3] There was no fixed amount of principal obligation; the amount ultimately to be received by the alleged "creditors" depended upon the number of lots sold. Even if the total number of lots to be carved out of the 20 acres were accurately determinable in advance and it be assumed that all of these lots would be sold, the ultimate amount to be received by the landshare holders would not be determinable since the amount is also dependent upon the price at which lots are sold, a factor which might vary over the future years. Furthermore, since there was no fixed principal amount owed, there was no interest payable. We recognize that a sale may be made and the consideration therefor may be based on a percentage of the resale price, but here on the evidence of record we can only conclude that no such transaction took place.

Not only does petitioner's obligation lack the principal elements of debt, but the interests of the landshare holders evidence the principal characteristics of equity interests. Petitioner was an empty shell without capital or assets of any kind before it acquired Petitjean's land and promise to begin development. Of primary importance is the fact that the ultimate receipt of payment by the landshare holders is completely dependent upon sales by the alleged "debtor"; the sole obligation petitioner had to Petitjean and his transferees was at the risk of its cemetery operation; sales proceeds are the sole source for payment to these landshare holders and in the absence of sales, payments could not be made. This arrangement embodies the very essence of an equity interest, "a participation in the pot luck of the enterprise." *Aqualane Shores, Inc.* v. *Commissioner*, 269 F. 2d 116, 119 (C.A. 5, 1959), affirming 30 T.C. 519 (1958). "When the payment to the transferors is dependent on the success of an untried undercapitalized business with uncertain prospects, a strong inference arises that the transfer is an equity contribution." *Burr Oaks Corporation* v. *Commissioner*, 365 F. 2d 24 (C.A. 7, 1966), affirming 43 T.C. 635 (1965).

The petitioner itself analyzed the situation accurately when Petitjean, its president, made the following explanatory statements to the Internal Revenue Service. In his first letter, dated March 13, 1959, he stated that the land was purchased for $6,000 and that he had an appraisal of the property. He concluded by stating that the landshare payments represented "*a return to the investors* in the Knollwood Memorial Gardens Association." (Emphasis supplied.)

---

[3] Although petitioner produced testimony that its obligation would terminate 20 years from the date of the agreement, the portion of the agreement quoted in our findings indicates that termination is to be 20 years from the date of full payment for the sale of the last lot.

Later he made this further explanatory statement in a letter dated September 29, 1959, to the Internal Revenue Service:

The land share is nothing else but a contract stating the fact that *I, Robert Petitjean, had a land purchase agreement with the Cemetery Association* and that I was to receive 20% of the sales of said lots and that in consideration of the amount of money *contributed by* a land share holder, that he would receive a certain percentage of the land share. *The land shares holders would not receive any interest on this money contributed by them. Only and when any lots were sold by the Association and the 20% received by Mr. Petitjean, only and at that time would any of the land share holders receive any money on their investment. If no money was received through this assignment of the land purchase agreement, then and in that case, the land share holders would receive nothing.* [Emphasis added.]

Further recognition by the parties to the various agreements of the true nature of the landshare holders' interest is evidenced by the repeated use of the term "investors" to describe those who would share in the proceeds of the enterprise. Our findings of fact emphasize the frequent use of this term throughout the documents from which we have quoted at length.

Furthermore, the cemetery operations, upon which the landshare holders depend for their receipt of payments are here controlled by the landshare holders themselves. See *Emanuel N. (Manny) Kolkey,* 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1958). Robert Pettitjean, the principal landshare holder, was the promoter of the cemetery organization, and he served as the overseer and general manager of its operations. He was its president, and Patricia Petitjean, his wife, was secretary and treasurer. They were both also trustees during each of the fiscal years here involved. Bernard J. Bertrand, a landshare holder in fiscal 1958 and 1959, and Helen M. Bertrand, presumably a member of his family, served as trustees for fiscal 1958 and 1959. H. E. Majeski, a landshare holder throughout the period in question, and Virginia Majeski, presumably a member of his family, served as trustees for fiscal 1960 and 1961. Thus, for each of the years here involved, four of the six governing trustees of petitioner were landshare holders and relatives of landshare holders, and petitioner's principal officers were Petitjean and his wife.

That there was little likelihood of the members changing control and management of petitioner is disclosed by Petitjean's own testimony that only three or four members ever attended any meetings and that efforts to increase attendance of members proved futile. As respondent points out on brief, even if petitioner's membership should subsequently become active in corporate affairs and vote the investor group out of management and control, petitioner will still remain liable to them for 20 odd years under the agreement they worked out and had executed when they were in control.

Under the land purchase agreement the landshare holders are entitled to a 17-percent [4] participation in the proceeds of petitioner's sales of a potential of 17,000 cemetery lots. These lots were selling for $75 each on a preneed basis during the years in question, and were offered for sale on a need basis at $150 each. The potential return to the landshare holders from the original transfer to the petitioner of land valued at $6,000 and improvements worth $7,520.50 is in excess of $200,000. During the taxable years in question, the first 4 years of petitioner's operation, landshare holders have already received a total of $52,374.77.

These statistics bring home the fact that in reality there was no *sale* of land and improvements to petitioner by them. When, as here, the alleged "purchase price" bears no reasonable relationship to the fair market value of the assets conveyed, it is stretching normal definition beyond its breaking point to regard the transaction as a sale. The transaction was a contribution to capital placed at the risk of the business, and as such no debt was created; payments to landshare holders, "investors" in the cemetery enterprise, were distributions with respect to their respective proprietary interests. *Burr Oaks Corporation, supra,* and *Sherwood Memorial Gardens, Inc., supra.*

It is argued by petitioner that no one could possibly be regarded as having an equity interest in petitioner since under the laws of Wisconsin, petitioner could not be operated for profit and could not issue stock. Chapter 157.09 of the 1955 Wisconsin Statutes provides: "The proceeds of sales shall be used only to apply on the purchase of the grounds, the care and improvement of the cemetery and avenues leading thereto, and operating expenses." Thus, petitioner urges there is no provision permitting the distribution of sales proceeds as profit to any equity interest; they must be used solely for the cost of operation, including the cost of land sold.

Respondent, however, points out that this statute imposes no requirement that the purchase price of the land be reasonable, and that for Federal tax purposes we should not be bound by the unenforced technicalities of State statutes. He also points out that in certain jurisdictions profit-sharing arrangements in cemetery land transactions have been questioned and disapproved, citing cases in State courts.

While petitioner's operation in form may comply with the letter of the Wisconsin cemetery statute, in substance, it appears to us to violate the spirit of that law. As we have already discussed, the payments (both actual and potential) to landshare holders were so far out of line with the fair market value of the property and improvements which petitioner acquired that it would be clothing nonsense with the dignity

---

[4] Twenty percent of gross sales reduced first by 15 percent placed in the perpetual care fund.

of words to say that such payments were made "to apply on the purchase of the grounds," or the "care and improvement of the cemetery."

Petitioner produced testimony that the landshare method of cemetery operation was common and widespread in Wisconsin and that the 20 percent of sales proceeds received by the landshare holders in the instant case was clearly not unusual and not at all out of line with the prevailing practice. If the payments ultimately to be received by the landshare holders of the other Wisconsin cemeteries referred to by petitioner's witnesses are as much in excess of the fair market value of the property received by those cemeteries as such payments are in the instant case,[5] we can only conclude that apparently no one in Wisconsin has found it necessary to enforce the Wisconsin cemetery statute [6] in the same manner as the Commissioner is obliged to enforce the revenue laws. Cf. *Bellefontaine Federal Savings & Loan Association*, 33 T.C. 808, 811 (1960); *Gulf Power Co.*, 10 T.C. 852, 857 (1948). The fact that payments to landshare holders which are in form "payments on the purchase of the grounds" have not been challenged by Wisconsin authorities as in substance payments with respect to equity interests,[7] does not preclude us from sustaining such a challenge by respondent for Federal income tax purposes. As we stated in *Sherwood Memorial Gardens, Inc.*, *supra*, with regard to Maryland State law (42 T.C. at 231):

Although the placing of funds by an investor at the risk of success of a business may be a criterion for debt treatment in Maryland * * * just the opposite is true for Federal income tax purposes—which purposes are not to be circumscribed by State law. *Weller* v. *Commissioner*, 270 F. 2d 294 (C.A. 3, 1959), affirming 31 T.C. 26 and 31 T.C. 33. See also *Haffenreffer Brewing Co.* v. *Commissioner*, 116 F. 2d 465 (C.A. 1, 1940).

Our conclusion that the landshare holders had an equity interest in petitioner leads us also to the further conclusion that petitioner is not a tax-exempt organization under section 501(c)(13). Petitioner is not operated exclusively for the benefit of its members; it is operated at least in part for the benefit of the landshare holders,

---

[5] It is possible that in the case of the other cemeteries referred to by petitioner's witnesses, the landshare method could fairly be regarded as in substance a sale. The payments to be received by the landshare holders might well be in line with the fair value of the land conveyed. Such might have been the situation in the instant case, for example, if the market value of the land conveyed to the cemetery had been greater, or if the total number of lots to be sold or the per-lot sales price had been lower, or if the landshare holder's interest had been limited in time or by a maximum amount. Landshare arrangements were held to have resulted in an ultimate purchase price which was reasonable payment for value received in *Rose Hill Memorial Park, Inc.*, T.C. Memo. 1964–240, and *Washington Park Cemetery Association, Inc.*, T.C. Memo. 1963–268.

[6] See also Raby, "Cemeteries, whether exempt or taxable, have tricky tax problems," 14 J. Taxation 281 (May 1961).

[7] Compare the situation in New York where the statute permitting landshare interests of up to 50 percent was amended, as a result of extensive profiteering and other abuses, to prohibit payments in excess of reasonable market value. See Walsh & Walsh, "The 1949 Revision of the Membership Corporation Law in Regard to Cemetery Corporations," 24 St. John's L. Rev. 174 (1949).

who receive a portion of the proceeds of every sale petitioner makes. Thus, petitioner is operated for profit; not necessarily or only for the profit of itself as a corporate entity, but for the profit of the landshare holders. Clearly, as discussed above at length, a portion of the petitioner's net earnings inures to the benefit of the landshare holders; payments to landshare holders, though disguised as acquisition cost of land sold, deductible from gross income in arriving at net earnings, are in substance distributions of net earnings. *Sherwood Memorial Gardens, Inc., supra; Gardens of Faith, Inc., supra.*

Petitioner relies heavily upon *Kensico Cemetery*, 35 B.T.A. 498 (1937), affd. 96 F. 2d 594 (C.A. 2, 1938), nonacq. 1937–1 C.B. 40; and *Forest Lawn Memorial Park Association, Inc.*, 45 B.T.A. 1091 (1941), nonacq. 1942–2 C.B. 25, withdrawn and acq. 1946–2 C.B. 2, withdrawn and nonacq. 1960–2 C.B. 8, two cases which are superficially and at first blush similar to the instant case.[8] In both of them we held that the petitioner cemetery was tax exempt under the predecessor of section 501·(c) (13). Both cases involved conveyances of property to the cemeteries, which were nonstock, nonprofit organizations under State law, in exchange for the right to 50 percent of the sales proceeds of all lots sold, unlimited as to maximum amount. In both cases, the transactions were pursuant to State laws which specifically permitted nonstock cemeteries to acquire land under such an arrangement and to pay up to *50* percent of proceeds from sales of lots therefor.

In *Sherwood Memorial Gardens, Inc., supra*, a case which involved a for-profit cemetery corporation, we distinguished *Kensico Cemetery* and *Forest Lawn*, as follows:

In *Kensico Cemetery*, the Commissioner argued that land share certificates, issued by a New York nonprofit membership cemetery corporation, were stock, that distributions made with respect to such certificates were dividends, and that a part of the net earnings of the cemetery corporation were thus inuring to the benefit of private individuals. Relying principally on *Am. Exch. Nat. Bank* v. *Woodlawn Cemetery, supra*, we pointed out the disability of Kensico cemetery to issue stock, thus destroying the predicate upon which the Commissioner's argument was based.[12] *Forest Lawn Memorial Park Association, Inc.*, involved a California nonprofit nonstock cemetery corporation whose exemption from tax was questioned on the ground that a part of its net income was inuring to the benefit of private shareholders. We specifically found that the California statute permitting the organization of such cemetery corporations prohibited the distribution of gains, profits, or dividends to members thereof. Petitioner in the instant case is neither nonprofit, nonstock, nor is it under any prohibition from distributing its earnings to those who have an equity investment in it. It occupies a position which clearly is distinguishable from that of *Forest Lawn.* * * * [Footnote omitted.]

---

[8] See also *Forest Lawn Memorial Park Assn., Inc.*, a Memorandum Opinion of this Court (Aug. 20, 1946), applying the same holding as the 1941 B.T.A. opinion to subsequent tax years.

As already indicated, we think the instant case is indistinguishable from *Sherwood* on the question of whether the landshare holders had an equity interest. In *Sherwood*, while we clearly held that equity interests could be owned by nonstockholders, we were able to distinguish *Kensico Cemetery* and *Forest Lawn* on the grounds that they involved nonprofit, nonstock cemeteries and *Sherwood* did not. While we cannot in the instant case distinguish *Kensico* and *Forest Lawn* on that basis since petitioner here is in form the same type of nonprofit, nonstock organization under State laws as were those two cemeteries, we do not see any meaningful or convincing difference between equity interests owned by nonstockholders in a thinly capitalized stock corporation and similar interests owned by individuals who contribute to nonstock corporations in return for such interests.

Section 501(c) (13) of the Code, denies tax-exempt status if part of the net earnings of a cemetery corporation, otherwise exempt thereunder, inures to the benefit of any *"individual"* whether or not a shareholder in the corporation. The statute thus specifically recognizes that corporate profits may wind up in the hands of nonstockholders, and whenever this happens, unless the corporation qualifies otherwise under the section, exemption is denied. We think the exemption should be denied in the case of nonstock membership corporations as well as in the case of stock corporations wherever the facts disclose that individuals share in the corporate profits because of equity interests. The net earnings of Knollwood's operation cannot be properly computed by first deducting payments to the landshare holders because those payments were not payments for the purchase price of land. Thus the distributions by whatever name called are of net earnings. In this respect this case is distinguishable from *Kensico* and *Forest Lawn* where we found the payments to be payments on debt for land acquired.

Also we regard the facts here as distinguishable from the facts involved in the older cases relied on by petitioner. In both *Kensico* and *Forest Lawn* established cemeteries were involved and the land acquisitions were of additional land needed for cemetery use; applicable State law provided that membership cemetery corporations were empowered to agree with persons from whom lands were purchased to pay therefor by a share or portion of the proceeds from lot sales; the certificates of indebtedness there involved were issued to the owners of land in consideration of a deed for the cemetery land acquired; they were agreements with the sellers of land to pay for such property; there was no showing as to the value of the land at the time nor was there evidence that the landowners had any control over or connection with the cemetery corporation or its operation. We determined that a true debt was created and that payments of a percentage of the sales proceeds derived from grave spaces represented cost of land which

should be properly deducted from the gross receipts of the cemetery corporation in determining its net earnings.

The transactions involved in *Kensico* and *Forest Lawn* appeared to be at arm's length, encouraged under the State laws then in existence and applicable to the cemetery corporations there involved. There was no evidence that they were rigged and contrived to permit the organizing investors to share in future profits of the cemetery operation. Here we have determined on all of the evidence of record that the landshare interests were granted, not to pay for land acquired, but rather to permit equity interests transferred to the organizing group to share in future profits. Wisconsin has no statutory provision authorizing cemetery corporations to agree to pay a percentage of future grave sales to acquire land. We need not express any views herein as to what conclusion we would reach if the Hougens had received landshares in consideration of the transfer of their land to petitioner, and Wisconsin had statutory provisions similar to those which existed in New York and California when the *Kensico* and *Forest Lawn* land acquisition transactions occurred.[9]

As is apparent in our overall approach to this case, we are of the opinion that the question of "nonprofit" status for tax-exemption purposes turns upon the analysis of whether in substance someone has an equity interest in the organization which yields returns if the enterprise succeeds so that profits in effect inure to the benefit of the individuals who invest in the venture. If unreasonable and excessive salary payments are made to an officer of a nonprofit corporation, then profits inure to the benefit of an individual and tax-exempt status will be denied. *Mabee Petroleum Corporation* v. *United States*, 203 F. 2d 872 (C.A. 5, 1953). Unreasonable rents paid to individuals leasing properties to an otherwise tax-exempt corporation may also lead to denial of exemption because part of the net earnings of the corporation inures to the benefit of individuals. *Texas Trade School*, 30 T.C. 642 (1958), affirmed per curiam 272 F. 2d 168 (C.A. 5, 1959).

We agree with respondent that this view and approach must be taken here. The return which the investor group has secured for its members is patently unreasonable and excessive as cost of the assets acquired so that net profits inure to the benefit of Petitjean, et al. After a careful consideration and analysis of all of the evidence, it seems clear that in return for $13,520.50 the participants are potentially interested in a gross potluck of the enterprise of $1,275,000 (17,000 grave spaces at $75 each). Their share of this return might eventually exceed $200,000, and, of course, if graves are subsequently

---

[9] As we pointed out in *Sherwood Memorial Gardens, Inc.*, 42 T.C. 211, 231, fn. 12, the New York Membership Corporation Law involved in *Kensico* has been since amended to forbid cemetery associations from paying more than the fair and reasonable market value of land purchased.

sold on a need basis or if the prices go up over the years the potential share also increases. In the first 4 years of Knollwood's operation, the investor group collected in excess of $50,000, and they still had many graves and a number of years to go. The group of "investors" who hold landshares are obviously sharing in the net profits of Knollwood Memorial Gardens, which not only inure to their benefit, but which are regularly distributed as grave spaces are sold. This approach was not taken in the very much older cases—*Kensico Cemetery* and *Forest Lawn*—both of which predated *Sherwood* by more than 20 years.

In both *Kensico* and *Forest Lawn* virtually conclusive weight was given the facts that State law and the organizations' own respective charters prohibited the issuance of stock and any distribution of profits. Thus, form was given controlling significance and no searching inquiry was made into the true nature of the landshare arrangements. In *Kensico Cemetery*, 96 F. 2d at 596, the circuit court stated "The exemption provision of the statute may not be construed to classify creditors whose debts are paid, as private shareholders or individuals to whose benefit the net incomes of the corporation inures. * * * what is paid [to the landshare certificate holders] does not constitute net earnings from the corporation. Here the cemetery net earnings are arrived at only after the elimination of payments made on the certificates." [10] See also language to the same effect in *Forest Lawn*, supra at 1103 and 1104. By thus defining "net earnings" this language avoids inquiring into whether payments designated as cost of land are in fact not such at all, but rather are in substance distributions of net earnings. Such a formal definition fails to cope with the indirect inurement to private benefit found existent in cases like *Sherwood*, *Mabee Petroleum*, and *Texas Trade School*.[11]

Such indirect inurement, we are certain, would not have been countenanced by the cautiously benevolent group of senators who in 1921 created the tax exemption for cemeteries. The following excerpts from the Senate debate,[12] in which was hammered out the language which remains today as the basic framework of section 501 (c) (13), indicate rather poignantly the overriding concern that the Senators' benignancy be not perverted so as to abet those who would "make money out of the burial of the dead":

Mr. SPENCER. * * * Now, everybody knows that where a corporation buys land by the acre and sells it by the square foot there is a profit that is simply phenomenal; and if that profit goes to the stockholders, of course, the cemetery company ought to pay a tax. If that profit goes to the beautification of the cemetery, then I agree with the Senator from Tennessee.

\*          \*          \*          \*          \*          \*          \*

[10] And, therefore, none of the "net earnings" inure to the benefit of any private individual.

[11] See Lanning, "Tax Erosion and the 'Bootstrap Sale' of a Business—I," 108 U. Pa. L. Rev. 691 (1960).

[12] 61 Cong. Rec. 7487–7490 (1921).

Mr. WILLIAMS. \* \* \* It [the proposed exemption] has nothing whatever to do with any other sort of business except a cemetery business. It says:

That any corporation chartered solely for burial purposes as a cemetery incorporation—

Mr. LODGE. That is precisely the point. It is to exempt from taxation the people who make money out of the burial of the dead.

Mr. WILLIAMS. Mr. President, if I thought that that was the object of this amendment, which bears my name, I should be very much ashamed of ever having offered it. If I had the slightest idea that I had offered an amendment in the United States Senate to exempt from taxation anybody that wanted to make an income out of the dead, I should be more ashamed of it than if I had been a Massachusetts Republican offering a tax law in order to tax the people generally in order to make an income from the living. I should be worse ashamed, even; but I do not find that this bears that construction at all.

\*      \*      \*      \*      \*      \*      \*

Mr. WILLIAMS. \* \* \*

\*      \*      \*      \*      \*      \*      \*

*My object in offering this amendment is to reach a case where a number of people come together and form a cemetery corporation merely and solely to bury people, and to make no profit out of it, except, perhaps, incidentally the profits accruing from the appreciation of the value of the real estate.* In this particular case to which I have reference, where the real estate was bought while Andrew Jackson was living, there would be an immense appreciation, of course; *but they did not purchase the land with that in view; that was not their purpose.*

\*      \*      \*      \*      \*      \*      \*

Mr. McCUMBER. *The object is to exempt them from any corporate taxes so long as they are exclusively engaged in the business referred to, and so long as all of their income is used to beautify the cemetery, and to be expended upon the cemetery, and no part of its profits are to inure to the benefit of any stockholder or individual.*

Mr. KING. But suppose some of its profits are distributed in the form of dividends; while it is true that the distributees would pay their normal taxes or their surtaxes according to the extent of their incomes, I see no reason why the corporation itself in a case of that kind should not pay its corporate tax.

\*      \*      \*      \*      \*      \*      \*

Mr. McCUMBER. If the profits are distributed, it comes without the provision of this amendment.

It permits the profit to be used for public purposes and for the most worthy purposes for which it could be used, the keeping up of the cemetery.

Mr. KING. \* \* \* I know that many of the corporations have charged extravagant prices for the lots which they have sold, and have made very large profits. Corporations of that character ought to pay the same as other corporations organized for the purpose of making profits, whether in trade, or in commerce, or anything else.

Mr. McCUMBER. *If all profits are utilized for beautifying the cemetery and keeping it up, they ought not to have to pay.*

[Emphasis supplied.]

There is no indication in *Kensico Cemetery* (in either the B.T.A. or the Second Circuit opinion) or in *Forest Lawn* that the above-quoted legislative history was considered in interpreting the then-governing predecessors of section 501(c)(13). We feel strongly that this con-

gressional debate is incompatible with a formalistic approach in this case. Judicial literalism [13] that produces tax exemption for cemeteries which are commonly recognized today as highly lucrative business enterprises, may well contribute considerably to the public criticism which has lately befallen the so-called American Way of Death.[14] As we observed in *Sherwood*, at pages 229, 230 :

Perhaps years ago the land share method of procuring cemetery property was the only way in which such property could be gotten because of the very slow and unprofitable nature of sales in the cemetery business. But these are modern times and the tax law must be sufficiently flexible to cope with them. No longer is the burial of the dead the exclusive province of the community, but fortunes are daily reaped from such activities by many private individuals.[11] * * * [Footnote omitted.]

In the many years since *Kensico* and *Forest Lawn*, the state of judicial mind illustrated in those cases has undergone a noticeable change. *Texas Trade School, supra; Mabee Petroleum Corporation* v. *United States, supra*. The unmasking for tax purposes of equity masquerading as debt has become a basic concept in effective enforcement of the revenue laws and in just resolutions of controversies before the courts. Leading cases such as *Burr Oaks Corporation* v. *Commissioner, supra; Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2, 1957) ; *Emanuel N. (Manny) Kolkey, supra;* and *Gooding Amusement Co.*, 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), all decided many years after *Kensico* and *Forest Lawn*, have clearly established the proposition that an interest which appears in bare outline to be a creditor interest may, underneath, lack most of the usual characteristics of debt, so that it is in reality an equity interest, and those cases have established a group of tests to be applied to determine whether substance and form are one and the same. These tests were applied by us in *Burr Oaks Corporation, supra*, and *Sherwood Memorial Gardens, supra*, and must be applied here.

Because inquiry into the true nature of cemetery landshare arrangements is essential to the resolution of questions of the type posed in this case, and because the earlier cases relied on by petitioner, are, at least to some extent, inconsistent with more recent developments in the law and the current attitude of this and other courts, we cannot agree with petitioner's arguments here that this case is controlled by *Kensico Cemetery* and *Forest Lawn*. Those cases cannot be read as

---

[13] In his discussion of *Kensico Cemetery* and *Forest Lawn* in 1960 Lanning states : "The handling of these cemetery problems may have suffered from the fact that they represent a secluded corner of the tax law which to date [1960] has been given inadequate public attention. This may be a product of a cultural proclivity to shy away from death and any of its trappings. Revenue agents and others are often reluctent [sic] to inquire too closely into the details of cemetery operation, mortuaries, burial and death." 108 U. Pa. L. Rev. 692, fn. 296.

[14] See Mitford, American Way of Death, chs. 9 and 10 (1963). See also fn. 13, *supra*.

dictating the granting of tax-exempt status to cemetery corporations just because the corporation is in form a membership or nonprofit organization under State law and the landshare arrangement, by whatever name it may be called, recites that payments thereunder are for land costs.

In the light of the legislative history of section 501(c)(13) and its precursory provisions of the internal revenue laws and of the authorities cited and discussed herein, we can only conclude and hold that petitioner here, even though technically and formalistically a nonprofit membership cemetery corporation, is not entitled to tax exemption. The payments made by petitioner to its landshare holders were nondeductible distributions with respect to equity interests, not land costs deductible from gross receipts in determining net income. Petitioner was operated for the benefit and profit of the Petitjean group not exclusively for its members and part of its net earnings inured to those individuals.

In his amended answer, respondent disallowed as a deduction for each of the years in question the entire amounts designated by petitioner as landshare holder expense. To disallow these amounts in their entirety is to permit *no* deduction for cost of lots sold and to tax gross sales (reduced only by overhead, sales expense, etc.) without permitting tax-free recovery of basis. On brief respondent has conceded that petitioner should be allowed a basis of $13,520.50 in the whole 20-acre tract acquired in the so-called land purchase agreement.[15] Petitioner has presented no argument on the basis question, and we assume that petitioner seeks no more than $13,520.50 as its basis in the entire 20-acre tract. We believe that $13,520.50 is the correct basis and we so hold.

The parties have stipulated to the proper allocation of portions of this total basis to the lots sold during each of the years here in question. Thus, the net deficiencies herein may be determined under Rule 50.

Petitioner has raised the alternative contention that even if it is determined not to be a tax-exempt organization, nevertheless, the respondent is barred from assessing a deficiency for fiscal 1958 by reason of the 3-year statute of limitations. Respondent maintains that petitioner never filed the proper corporate tax return necessary to start the statute of limitations running.

Petitioner did not for any of the taxable years here in question file a Standard Corporate Income Tax Return (Form 1120). For the

---

[15] If, as we have held, the acquisition by petitioner of the tract plus improvements was in substance a capital contribution by Robert Petitjean, petitioner's basis would be a carryover of Petitjean's basis under either sec. 362(a)(1), see *Sherwood Memorial Gardens, Inc.*, 42 T.C. at 232, fn. 13, or sec. 362(a)(2). Petitjean's basis was $13,520.50, consisting of $6,000, cost of land transferred, plus $7,520.50, cost of improvements supplied.

fiscal years 1958, 1959, and 1960, however, it filed exempt organization returns (Form 990). Section 6501(g)(2) of the 1954 Code provides:

(g) CERTAIN INCOME TAX RETURNS OF CORPORATION.—

\* \* \* \* \* \* \*

(2) EXEMPT ORGANIZATIONS.—If a taxpayer determines in good faith that it is an exempt organization and files a return as such under section 6033, and if such taxpayer is thereafter held to be a taxable organization for the taxable year for which the return is filed, such return shall be deemed the return of the organization for purposes of this section. [i.e., the commencement of the 3-year limitation period.]

Petitioner contends that its exempt organization return for fiscal 1958 was sufficient to begin the limitation period as provided in this subsection, but respondent takes the position that the subsection is not applicable since petitioner did not determine *in good faith* that it was an exempt organization.

Petitioner, relying upon the statute of limitations, has the burden of proving that the assessment is barred thereby. *Edward M. Lawrence*, 3 B.T.A. 40 (1925). This burden includes the burden of proving the good faith essential to the applicability of section 6501(g)(2). Respondent contends that petitioner could not have had a good faith belief that it was exempt, because it continually made incomplete and misleading statements to the Internal Revenue Service in connection with its request for an exemption ruling. It is argued that one with a good faith belief would not find it necessary to make misleading statements; therefore, one who makes misleading statements could not have the requisite good faith belief.

We agree with respondent that petitioner, through Robert Petitjean, its president and legal counsel, did make materially incomplete and misleading statements in its attempt to get a ruling that it was tax exempt. We have set forth at some length in our Findings of Fact excerpts from letters which Petitjean wrote to the Internal Revenue Service, which excerpts, when contrasted with the actual facts as we have found them from the record, indicate the nature and extent of the misstatements alleged by respondent. Certainly such conduct on the part of a taxpayer seeking a ruling is to be condemned. However, we disagree with the process of reasoning by which respondent has concluded that petitioner could not have filed its Form 990 returns in good faith.

Respondent urges that petitioner's use of misleading statements conclusively indicates that petitioner did not in fact believe it was exempt. We do not agree. It is not at all unlikely that petitioner did believe, based upon its construction of the Code and the case law, at the time it filed Form 990 for its first fiscal year that it was exempt. It was, however, subsequently realized that the Commissioner, upon his interpretation of the law, would hold otherwise. The statute does

not require a good faith belief that the Commissioner will hold the organization exempt (or that it is exempt under the Commissioner's view of the law), but only a good faith belief under the organization's own reasonable view of the law (which may differ from the Commissioner's view) that it is exempt. Thus an organization could in good faith believe itself exempt, yet still make misleading statements out of fear that under the Commissioner's stricter or different interpretation of the law he would not agree. We believe that this was the situation in the instant case.

At the time the petitioner's Form 990 return for the 1958 fiscal year was filed, it was stated that the land was acquired from the Hougens for $6,000. Most of the misleading and inaccurate statements relied on by respondent occurred in subsequent correspondence. Also at that time the leading cases in this area were *Kensico Cemetery* and *Forest Lawn*, both of which upheld exempt status in situations indistinguishable in certain material respects from petitioner's, and both of which had been substantialy unchallenged for over 15 years. *Kensico Cemetery* had been affirmed by the Second Circuit. Although a nonacquiescence had been announced in *Kensico Cemetery* as early as 1937 (1937–1 C.B. 40), a 1946 acquiescence in *Forest Lawn* was outstanding until 1960 (1946–2 C.B. 2), and Rev. Rul. 61–137, 1961–2 C.B. 118, in which the respondent belatedly made clear his position in this area and specifically refused to follow *Forest Lawn*, was not promulgated until 1961. Finally, the *Sherwood* case, which was instrumental in establishing the present judicial climate so unfavorable to cemetery landshare transactions, and upon which we rely heavily in reaching our holding against petitioner on the principal issues herein, was not decided until as recently as 1964 (affirmed in 1965).

Thus, on the state of the case law at the time petitioner filed a Form 990 return for fiscal 1958, we believe it entirely likely that a cemetery organization such as petitioner would believe in good faith that it was tax exempt. Petitioner testified that he relied upon his knowledge of other similar cemeteries, at least one of which allegedly had "attained exemption status," and upon the "court decisions," with which he claimed to be thoroughly and currently familiar at all times from the time of petitioner's organization right up to the date of trial, in determining that petitioner was exempt and should file exempt organization returns.

Though it is a very close question, made particularly difficult by the damaging inferences raised by petitioner's communicating misleading information to the Internal Revenue Service in subsequent efforts to obtain tax-exempt status, we have concluded that petitioner has carried its burden of proving its good faith in determining that it was an exempt organization under prevailing case law at the time it filed a Form 990 return for fiscal 1958. This being the case, the deficiencies and ad-

ditions to tax for fiscal 1958 are barred by the statute of limitations. Though we resolve the question in petitioner's favor in the particular circumstances here presented, we would repeat that we look with disfavor upon the use of incomplete and/or misleading information in dealing with the Government—particularly in the matter of attaining the privilege of the tax-exempt status reserved by public policy to those organizations which promote the general welfare of society rather than private ends.

The final issue in this case is whether petitioner is liable for 25-percent additions to tax (commonly referred to as "delinquency penalty") for failure to file Form 1120, Corporate Income Tax Returns, for each of the years 1959, 1960, and 1961.[16] Section 6651(a) of the 1954 Code imposes a so-called delinquency penalty for failure to timely file a required return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Petitioner contends it had a good faith belief that it was exempt from tax and therefore not required to file Form 1120 returns, that it filed Form 990 returns instead, and that, therefore, its failure to file Form 1120 returns was due to reasonable cause and not willful neglect. Although we have held above that petitioner's good faith belief that it was tax exempt in March of 1959 was sufficient to permit its Form 990 return to start the running of the statute of limitations under section 6501(g)(2), for its 1958 fiscal year, such a good faith belief is not sufficient to avoid the delinquency penalty of section 6651(a) asserted for the other 3 years before us.

Section 1.501(a)–1(a)(2), Income Tax Regs., provides in part as follows:

> An organization * * * is not exempt from tax merely because it is not organized and operated for profit. In order to establish its exemption, it is necessary that every such organization claiming exemption file an application form as set forth below with the district director for the internal revenue district in which is located the principal place of business or principal office of the organization. * * *

Section 1.6033–1(c), Income Tax Regs., provides in part:

> *Returns when exempt status not established.* * * * If the date for filing an income tax return and paying the tax occurs before the tax-exempt status of the organization has been established, the organization is required to file the return and pay the tax. * * *

See also *F. E. McGillick Co.*, 30 T.C. 1130, 1150 (1958), affirmed on this issue 278 F. 2d 643 (C.A. 3, 1960).

Thus, it is clear that a good faith belief that an organization is exempt is not reasonable cause for failure to file the prescribed 1120

---

[16] As a result of our holding that the 1958 deficiency is barred by the statute of limitations there can be no delinquency penalty imposed for that year. *Palm Beach Aero Corporation,* 17 T.C. 1169 (1952).

return, since the regulations clearly provide that Form 1120 is required in all cases prior to the issuance of an exemption ruling. This requirement is reasonable and a proper exercise of the Commissioner's regulatory authority, particularly since an organization is free to request extensions of time for filing while its exemption application is pending. No such extensions were requested by petitioner in the instant case.

In *West Side Tennis Club*, 39 B.T.A. 149 (1939), affd. 111 F. 2d 6 (C.A. 2, 1940), certiorari denied 311 U.S. 674 (1940), we stated (39 B.T.A. at 160) :

Nothing more than belief that one is not required to file a return is not enough to discharge the penalty. *Eagle Piece Dye Works*, 10 B.T.A. 1360; *Rafael Sabatini*, 32 B.T.A. 705; affd., 98 Fed. (2d) 753, in which the court said: "The taxpayer may well have believed that he was liable for no tax and yet have had no reasonable cause for not filing timely returns."

To similar effect see, e.g., *Fraternal Order of Civitans of America*, 19 T.C. 240 (1952); *Automotive Electric Assn.*, 8 T.C. 894 (1947), affirmed without mention of this point 168 F. 2d 366 (C.A. 6, 1948).

The filing of Form 990 information returns for fiscal 1958, 1959, and 1960 does not constitute reasonable cause or demonstrate absence of willful neglect in failing to file the Form 1120 returns required by the regulations quoted above. *Automobile Club* v. *Commissioner*, 353 U.S. 180 (1957), affirming 20 T.C. 1033 (1953); *F. E. McGillick Co.*, *supra*.

For fiscal 1961 petitioner filed no return, not even a Form 990 information return. It is contended that the failure to file for 1961 was due to reasonable cause "because the examining agent picked up all the figures for this return himself." It has been stipulated that an internal revenue agent did, in fact, prepare substitutes for returns for each of the years in question including the 1961 fiscal year. These substitutes were filed September 14, 1962.

Robert Petitjean testified that he "felt it rather ridiculous to again make out additional returns and sign them and send them in when the internal revenue agent came over with me and with my help of giving him all the figures and facts made out his own return and sent them in." However, petitioner's corporation income tax return for its fiscal year ended October 31, 1961, was required to be filed on or before January 15, 1962. See sec. 6072(b), I.R.C. 1954.

The returns prepared by respondent's agents were not filed until September 1962. Thus, as of the due date for filing for fiscal 1961, the 1961 return eventually prepared by the agents had not yet been filed. Moreover, a taxpayer may not avoid its obligation to timely file a required return by alleging reliance upon a third party to file for it when there is no showing of any agency relationship or a reasonable cause for reliance, *Calvert Iron Works, Inc.*, 26 T.C. 770 (1956); here there is no evidence that respondent's agents had at any

time affirmatively told petitioner that it would not be necessary to file for itself a timely Form 1120 return. The fact that petitioner was undergoing an investigation of its tax liability, *Calvert Iron Works, Inc., supra,* and was engaged in a dispute with respondent over its liability for past years, *Martin A. Glowinski,* 25 T.C. 934 (1956), affirmed without discussion on this point 245 F. 2d 635 (C.A.D.C. 1957), at the time its 1961 return was due does not constitute reasonable cause for failure to file when due.

We hold that petitioner has failed to prove that its failure to file the prescribed Form 1120 corporation tax returns was due to reasonable cause and not due to willful neglect. Hence, the delinquency penalties imposed for the taxable years 1959, 1960, and 1961 are sustained.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DAWSON, *J.*, concurring: Judge Hoyt has skillfully placed in sharp focus the key issue of exemption under section 501(c)(13), unblurred by the narrowness of the decisions in *Kensico Cemetery* and *Forest Lawn.* As the author of the *Sherwood Memorial Gardens* opinion in this Court, I am in agreement with everything said here. About all I would add is that the time has arrived for giving the *Kensico Cemetery* and *Forest Lawn* cases gentle and decent burials. To the extent that the rationale of those cases is inconsistent with the views expressed in the majority opinion in this case I would no longer follow them.

WITHEY and TANNENWALD, JJ., agree with this concurring opinion.